Richard F. WILSON, et al., Appellants

v.

John R. BLOCK, Secretary of
Agriculture, et al.

The HOPI INDIAN TRIBE, Appellant,

v.

John R. BLOCK, Secretary of
Agriculture, et al.

NAVAJO MEDICINEMEN'S ASSOCIA-
TION, et al., Appellants,

v.

John R. BLOCK, Secretary of
Agriculture, et al.

NAVAJO MEDICINEMEN'S ASSOCIA-
TION, et al., Appellants,

v.

John R. BLOCK, Secretary of
Agriculture, et al.

The HOPI INDIAN TRIBE, Appellant,

v.

John R. BLOCK, Secretary of
Agriculture, et al.

Richard F. WILSON and Jean Wilson,
husband and wife, Appellants,

v.

John R. BLOCK, Secretary of
Agriculture, et al.

Nos. 81–1905, 81–1912, 81–1956, 82–1705,
82–1706 and 82–1725.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 15, 1982.

Decided May 20, 1983.

John A. MacKinnon, Tuba City, Ariz., with whom Elizabeth Bernstein and C. Benson Hufford, Tuba City, Ariz., were on the brief, for Navajo Medicinemen's Association, et al., appellants in Nos. 81–1956 and 82–1705. Daniel S. Press, Window Rock, Ariz., also entered an appearance for appellants in No. 81–1956. C. Benson Hufford, Tuba City, Ariz., also entered an appearance for Navajo Medicinemen's Association, et al., in No. 82–1725.

Charles R. Work, Chicago, Ill., with whom Robert W. Warden, Douglas J. Wall, Flagstaff, Ariz., John A. Hodges, and Robert A. Warden, Washington, D.C., were on the brief, for Richard F. Wilson and Jean Wilson, appellants in Nos. 81–1905 and 82–1725, and amici curiae in Nos. 81–1912, 81–1956, 82–1705 and 82–1706.

Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C., with whom Patricia J. Beneke and Robert L. Klarquist, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellees. Robert D. Clark, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellees in Nos. 81–1905, 81–1912 and 81–1956.

Richard McCune Shannon, Phoenix, Ariz., and Stephen P. Kling, Baltimore, Md., were on the brief for appellee, Northland Recreation Inc.

Ellen Leitzer, Albuquerque, N.M., was on the brief, for Eastern Band of Cherokee Indians, et al., amici curiae urging reversal in Nos. 81–1905, 81–1912 and 81–1956.

John Paul Kennedy, Salt Lake City, Utah, with whom David B. Lee, Salt Lake City, Utah, was on the brief, for Hopi Indian Tribe, appellant in Nos. 81–1912 and 82–1706. C. Benson Hufford, Tuba City, Ariz., also entered an appearance for appellant, in No. 81–1912. Richard M. Hymas, Salt Lake City, Utah, also entered an appearance for Hopi Indian Tribe in Nos. 82–1705, 82–1706 and 82–1725.

Before TAMM and GINSBURG, Circuit Judges, and LUMBARD,* Senior Circuit Judge, United States Court of Appeals for the Second Circuit.

Opinion for the Court filed by Senior Circuit Judge LUMBARD.

LUMBARD, Senior Circuit Judge:

These appeals challenge the grant of summary judgment by the District Court for the District of Columbia which affirmed the decisions of the Forest Service and the

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

Department of Agriculture to permit private interests to expand and develop the government-owned Snow Bowl ski area on the San Francisco Peaks in the Coconino National Forest just north of Flagstaff, Arizona. The appeals are brought by the Hopi Indian Tribe, the Navajo Medicinemen's Association and other Navajos, and Richard F. Wilson, et al. each of whom filed separate suits which were consolidated for trial by Judge Richey. We affirm.

The Navajo and Hopi Indian tribes are federally recognized tribes of American Indians. The Hopi reservation and most of the Navajo reservation are located in northeastern Arizona and encompass a total area of 25,000 square miles. Approximately 9,000 Hopis and 160,000 Navajos reside on the reservations.

The dominant geological formation visible from the Hopi villages and much of the western Navajo reservation is the San Francisco Peaks. The Peaks, which rise to a height of 12,633 feet, have for centuries played a central role in the religions of the two tribes. The Navajos believe that the Peaks are one of the four sacred mountains which mark the boundaries of their homeland. They believe the Peaks to be the home of specific deities and consider the Peaks to be the body of a spiritual being or god, with various peaks forming the head, shoulders, and knees of a body reclining and facing to the east, while the trees, plants, rocks, and earth form the skin. The Navajos pray directly to the Peaks and regard them as a living deity. The Peaks are invoked in religious ceremonies to heal the Navajo people. The Navajos collect herbs from the Peaks for use in religious ceremonies, and perform ceremonies upon the Peaks. They believe that artificial development of the Peaks would impair the Peaks' healing power.

The Hopis believe that the Creator uses emissaries to assist in communicating with mankind. The emissaries are spiritual beings and are generally referred to by the Hopis as "Kachinas." The Hopis believe that for about six months each year, commencing in late July or early August and extending through mid-winter, the Kachinas reside at the Peaks. During the remaining six months of the year the Kachinas travel to the Hopi villages and participate in various religious ceremonies and practices. The Hopis believe that the Kachinas' activities on the Peaks create the rain and snow storms that sustain the villages. The Hopis have many shrines on the Peaks and collect herbs, plants and animals from the Peaks for use in religious ceremonies. The Hopis believe that use of the Peaks for commercial purposes would constitute a direct affront to the Kachinas and to the Creator.

The San Francisco Peaks are within the Coconino National Forest and are managed by the Forest Service. A 777 acre portion of the Peaks, known as the "Snow Bowl," has been used for downhill skiing since 1937 when the Forest Service build a road and ski lodge. The lodge was destroyed by fire in 1952 and was replaced in 1956. Ski lifts were built at the Snow Bowl in 1958 and 1962. Since 1962 the facilities have changed very little.

In April 1977 the Forest Service transferred the permit to operate the Snow Bowl skiing facilities from Summit Properties, Inc. to the Northland Recreation Company. In July 1977 Northland submitted to the Forest Service a "master plan" for the future development of the Snow Bowl, which contemplated the construction of additional parking and ski slopes, new lodge facilities, and ski lifts. The Forest Service, pursuant to the National Environmental Policy Act, conducted public workshops and solicited alternatives to Northland's plan. The Forest Service evaluated the proposed alternatives and identified six which were feasible and represented the spectrum of public opinion. These alternatives ranged from complete elimination of artificial structures in the Snow Bowl to full development as proposed by Northland. On June 23, 1978 the Forest Service filed a draft Environmental Impact Statement evaluating the six alternatives. Between June 23 and September 30, 1978 the Forest Service solicited public opinion on the draft Environmental

Impact Statement. Special efforts were made to solicit the views of the Hopis and Navajos.

On February 27, 1979 the Forest Supervisor of the Coconino National Forest issued his decision to permit moderate development of the Snow Bowl under a "Preferred Alternative," which in fact was not one of the six alternatives previously identified. The Preferred Alternative envisions the clearing of 50 acres of forest for new ski runs, instead of the 120 acres requested by Northland. The Preferred Alternative also authorizes construction of a new day lodge, improvement. of restroom facilities, reconstruction of existing chair lifts, construction of three new lifts, and the paving and widening of the Snow Bowl road.

At the request of various persons, including certain of the plaintiffs, the Regional Forester on February 7, 1980 overruled the Forest Supervisor and ordered maintenance of the status quo. The Chief Forester on December 31, 1980 reversed the Regional Forester and reinstated the Forest Supervisor's approval of the Preferred Alternative.

On March 2, 1981, the Navajo Medicinemen's Association filed suit in the District Court for the District of Columbia, naming as defendants John R. Block, Secretary of Agriculture; R. Max Peterson, Chief Forester of the Forest Service; the Forest Service; and the United States. The complaint sought a halt to further development of the Snow Bowl and the removal of existing ski facilities. This suit was consolidated with similar suits brought by the Hopi tribe and Jean and Richard Wilson, owners of a ranch located a mile and a half below the Snow Bowl.

The plaintiffs alleged that expansion of the Snow Bowl facilities would violate the Indians' First Amendment right to the free exercise of religion, the American Indian Religious Freedom Act, the fiduciary duties owed the Indians by the government, the Endangered Species Act, two statutes regulating private use of national forest land (16 U.S.C. §§ 497, 551), the National Historic Preservation Act, the Multiple-Use Sustained Yield Act, the Wilderness Act, the National Environmental Policy Act, and the Administrative Procedure Act.

Pursuant to expedited procedures agreed to by all the parties, numerous affidavits were submitted together with a Joint Stipulation of Material Facts. The parties filed cross-motions for summary judgment. While these motions were pending the district court on May 27, 1981 permitted Northland to intervene as a defendant. After a hearing, Judge Richey on June 15, 1981 granted summary judgment to the defendants on all issues except the plaintiffs' claim under the National Historic Preservation Act. Finding that the Forest Service had failed to comply with certain requirements of that Act, Judge Richey remanded the cause to the Forest Service for further proceedings and stayed development until compliance. After the defendants reported back, Judge Richey on May 14, 1982 ruled that the Forest Service had achieved compliance and he entered final judgment for the defendants on all issues and vacated his stay. These appeals followed promptly and the defendants have agreed to delay development pending their disposition.

From our review of the record we are convinced that Judge Richey's conclusions of law are in accordance with precedent and not in error. Accordingly, we affirm the judgments. Our opinion considers in detail the claims raised by the plaintiffs under the following constitutional provisions and statutes: the Free Exercise Clause, the American Indian Religious Freedom Act, the Establishment Clause, the Endangered Species Act, the Wilderness Act, the National Historic Preservation Act, and 16 U.S.C. §§ 497, 551.

1. *Free Exercise of Religion.*

Religious freedom is guaranteed by the First Amendment, which states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The Navajo and Hopi plaintiffs contend that development of the Snow Bowl is inconsistent with their First Amendment right freely to hold and prac-

tice their religious beliefs.[1] Believing the San Francisco Peaks to be sacred, they feel that development of the Peaks would be a profane act, and an affront to the deities, and that, in consequence, the Peaks would lose their healing power and otherwise cease to benefit the tribes. They contend that development would seriously impair their ability to pray and conduct ceremonies upon the Peaks, and to gather from the Peaks the sacred objects, such as fir boughs and eaglets, which are necessary to their religious practices. As relief, the Navajos and Hopis seek a phased removal of all artificial structures on the Peaks, or, at the least, an injunction against further development of the Snow Bowl. Judge Richey, although he recognized the sincerity of the plaintiffs' beliefs, held that a First Amendment claim had not been stated. He found that the government had not denied the Indians access to the Peaks or impaired their ability to gather sacred objects and conduct ceremonies, and thus had not burdened their beliefs or religious practices. We agree with Judge Richey that the plaintiffs have not shown an impermissible burden on religion.

■ To be protected by the Free Exercise Clause of the First Amendment, a belief or practice must be "rooted in religion." *Thomas v. Review Bd. of the Indiana Employment Sec. Div.,* 450 U.S. 707, 713, 101 S.Ct. 1425, 1429, 67 L.Ed.2d 624 (1981). The parties have stipulated that the plaintiffs' beliefs are religious and are sincerely held, and the record contains abundant evidence supporting that stipulation. We therefore proceed directly to apply the Free Exercise Clause to the plaintiffs' claims and the proof before us.

■ The Free Exercise Clause proscribes government action that burdens religious beliefs or practices, unless the challenged action serves a compelling governmental interest that cannot be achieved in a less restrictive manner. *See, e.g., Badoni v. Higginson,* 638 F.2d 172, 176–77 (10th Cir. 1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981), *Barnett v. Rodgers,* 410 F.2d 995, 1000 (D.C.Cir.1969). The initial burden of proof in free exercise cases is upon the plaintiff to demonstrate a burden upon religion. *See School Dist. of Abington v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963). Only if a burden is proven does it become necessary to consider whether the governmental interest served is compelling, or whether the government has adopted the least burdensome method of achieving its goal. In analyzing the plaintiff's contention that the ski resort expansion will burden their religions, we consider separately the effects of development upon their beliefs and upon their religious practices.

■ The plaintiffs stress that development of the Snow Bowl for a ski resort is grossly inconsistent with their beliefs. The Hopis and the Navajos believe that they owe a duty to the deities to maintain the San Francisco Peaks in their natural state. They believe that breach of that duty will lead to serious adverse consequences for their peoples. Navajo and Hopi religious practitioners are deeply troubled by the development that has already occurred upon the Peaks, and expansion of the Snow Bowl will increase their disquiet.[2]

1. Judge Richey properly ruled that Jean and Richard Wilson, who are not Indians, did not have standing to assert the Navajo and Hopi religious claims. *See, e.g., Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). We have, however, considered the Wilsons' briefs on the religious claims as briefs of *amicus curiae.*

2. The plaintiffs claim that further development of the Snow Bowl could have a serious and adverse impact upon their tribes' cultures and social organization. Abbott Sekaquaptewa, then-chairman of the Hopi tribe, stated in "Nar-

rative Direct Testimony" submitted to the district court:

It is my opinion that in the long run if the expansion is permitted, we will not be able successfully to teach our people that this is a sacred place. If the ski resort remains or is expanded, our people will not accept the view that this is the sacred Home of the Kachinas. The basis of our existence as a society will become a mere fairy tale to our people. If our people no longer possess this long-held belief and way of life, which will inevitably occur with the continued presence of the ski resort ... a direct and negative

■ The First Amendment right to hold religious beliefs is absolute. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The Free Exercise Clause "categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such." *McDaniel v. Paty,* 435 U.S. 618, 626, 98 S.Ct. 1322, 1327, 55 L.Ed.2d 593 (1978). Notwithstanding the plaintiffs' concerns, it is clear that the government has not regulated, prohibited, or rewarded their religious beliefs as such, nor has it in any manner directly burdened the plaintiffs in their beliefs. The Free Exercise Clause, however, also proscribes certain *indirect* burdens on belief. Arguing that an impermissible indirect burden has been imposed, the plaintiffs direct our attention to *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Thomas v. Review Board of the Indiana Employment Sec. Div.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981).

In *Sherbert,* the plaintiff, a Seventh-Day Adventist, was discharged by her employer because she refused to work on Saturday, the Sabbath Day of her faith. The South Carolina Employment Security Commission refused the plaintiff's application for unemployment benefits, finding that her religious convictions did not constitute "good cause" for refusing available work. The South Carolina Supreme Court upheld the Commission's determination. The Supreme Court reversed. The fact that no criminal sanctions compelled the plaintiff to violate her beliefs, said the Court, did not end the free exercise inquiry. Instead, held the Court, the government burdens the free exercise of religion when it conditions receipt of a government benefit, such as unemployment compensation, on conduct inconsistent with the recipient's religious beliefs. In *Thomas,* the plaintiff, a Jehovah's Witness, quit his job at a factory producing tank turrets because he believed armaments production to be inconsistent with his faith. The Indiana Supreme Court held that the plaintiff's decision to quit employment because of his religious convictions did not

constitute "good cause" and denied him unemployment benefits. The Supreme Court reversed, holding, as it did in *Sherbert,* that the government burdens free exercise when it forces an individual to choose between a government benefit and fidelity to religious belief. The Court stated:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

450 U.S. at 717–18, 101 S.Ct. at 1431–1432.

*Sherbert* and *Thomas* are not factually analogous to the present case. The government here has not conditioned any benefit upon conduct proscribed or mandated by the plaintiffs' beliefs. Acknowledging this factual distinction, the plaintiffs read *Sherbert* and *Thomas* broadly as condemning under the Free Exercise Clause governmental actions which strongly, if indirectly, encourage religious practitioners to modify their beliefs. Specifically, the plaintiffs argue that governmental actions which "desecrate and destroy the spiritual character of a religion's most sacred shrine" and which may thereby force practitioners "to fundamentally modify their religious doctrine to conform to the changed circumstance" create free exercise burdens under *Sherbert* and *Thomas.* We disagree. *Sherbert* and *Thomas* hold only that the government may not, by conditioning benefits, penalize adherence to religious belief. Many government actions may offend religious believers, and may cast doubt upon the veracity of religious beliefs, but unless such actions penalize faith, they do not burden religion. The Secretary of Agriculture has a statutory duty, *see, e.g.,* 16 U.S.C. §§ 471, 528 (1976) to manage the National Forests in the public interest, and he has determined that the public interest would best be

impact upon our religious practices [will result]. The destruction of these practices will

also destroy our present way of life and culture.

served by expansion of the Snow Bowl ski area. In making that determination, the Secretary has not directly or indirectly penalized the plaintiffs for their beliefs. The construction approved by the Secretary is, indeed, inconsistent with the plaintiffs' beliefs, and will cause the plaintiffs spiritual disquiet, but such consequences do not state a free exercise claim under *Sherbert, Thomas,* or any other authority.[3] In sum, the plaintiffs have not shown that expansion of the Snow Bowl will burden their freedom to believe. A separate question, to which we now turn, is whether expansion will burden the plaintiffs in the practice of their religions.

The plaintiffs must have access to the San Francisco Peaks to practice their religions. Certain of the plaintiffs' ceremonies must be performed upon the Peaks and religious objects must be collected there. Because the plaintiffs' religions are, in this sense, site specific, development of the Peaks would severely impair the practice of the religions if it destroyed the natural conditions necessary for the performance of ceremonies and the collection of religious objects. The plaintiffs claim that the Preferred Alternative will impair their religious practices in precisely that manner. Few courts have considered whether the Free Exercise Clause prohibits the government from permitting land uses that impair

specific religious practices. Of the cases which have considered this problem, we find *Sequoyah v. TVA,* 620 F.2d 1159 (6th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980), to be particularly instructive.

In *Sequoyah,* a class action brought on behalf of practitioners of the Cherokee religion, the plaintiffs sought to halt construction of the Tellico Dam on the Little Tennessee River. The plaintiffs alleged that the dam, when completed, would flood the Cherokee "sacred homeland" along the river, and would destroy "sacred sites, medicine gathering sites, holy places and cemeteries," and "disturb the sacred balance of the land." 620 F.2d at 1160. The Sixth Circuit affirmed a grant of summary judgment to the defendant, ruling that the plaintiffs, to establish a burden on free exercise, had to prove that the valley to be flooded was indispensable or central to their ceremonies and practices. The plaintiffs' proof was insufficient, held the court, as the evidence indicated that medicines obtainable in the valley could be obtained elsewhere, and that the flooding would not prevent the plaintiffs from engaging in any particular religious observances.[4]

■ Judge Richey relied upon the *Sequoyah* analysis in the present case, and held that the plaintiffs had failed to show

---

**3.** *Pillar of Fire v. Denver Urban Renewal Authority,* 181 Colo. 411, 509 P.2d 1250 (1973), is not to the contrary. In *Pillar of Fire,* the plaintiff church sought to enjoin the condemnation by an urban renewal project of its first permanent church building. The plaintiff alleged that its members revered the building for its historical and symbolic meaning in the birth of their sect. The Colorado Supreme Court held that the plaintiff was entitled to a court hearing at which its interests could be weighed against those of the renewal authority. "(R)eligious faith and tradition," said the court, "can invest certain structures and land sites with significance which deserves First Amendment protection." 181 Colo. at 419, 509 P.2d at 1254. A governmental taking of privately-owned religious property, however, involves different considerations than does a claimed First Amendment right to restrict the government's use of its own land.

**4.** Four cases in addition to *Sequoyah* have considered free exercise claims seeking to restrict development of government land. In *Badoni v.*

*Higginson,* 638 F.2d 172 (10th Cir.1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed.2d 695 (1981), Navajo religious practitioners believed that the Rainbow natural bridge, a great arch of sandstone located in the Rainbow Bridge National Monument in Utah, was sacred. They complained that a government reservoir which had partially inundated the bridge had covered some of their gods and prayer sites, and that the noisy tourists who visited the bridge desecrated the site and made ceremonies impractical. As relief, the plaintiffs requested the court to order the government to lower the reservoir, to issue regulations controlling tourist behavior, and on appropriate notice, to close the monument to tourists so that ceremonies could be conducted. The Tenth Circuit affirmed a district court decision denying relief. The Tenth Circuit held that the government had a compelling interest in filling the reservoir that outweighed any First Amendment right the plaintiffs might assert, and that closing the Monument, or restricting tourist behavior, to accommodate the plaintiffs' beliefs

the indispensability of the Snow Bowl to the practice of their religions. The plaintiffs challenge Judge Richey's reliance upon *Sequoyah* on two grounds. They argue first that *Sherbert* and *Thomas,* and not *Sequoyah,* establish the standard applicable to their claim. They contend that governmental action which indirectly imposes a burden upon religious practice greater than the burdens involved in *Sherbert* and *Thomas* necessarily violates the First Amendment. Contending that the Snow Bowl ski area effectively prohibits the practice of their religions, the plaintiffs claim that their burden is greater than that of the practitioners in *Sherbert* and *Thomas,* who, the plaintiffs say, could have continued to practice their beliefs simply by choosing to forego government benefits. However, as we previously stated, *Sherbert* and *Thomas* considered only whether the government may legally condition benefits on a decision to forego or to adhere to religious belief or practice. Those cases did not purport to create a benchmark against which to test all indirect burden claims. Second, the plaintiffs argue that *Sequoyah* incorrectly interpreted the First Amendment. They argue that the First Amendment protects all religious practices, whether or not "cen-

tral," and that courts are not competent to rule upon the centrality of religious belief or practice. We agree that the First Amendment protection of religion "does not turn on the theological importance of the disputed activity," *Unitarian Church West v. McConnell,* 337 F.Supp. 1252, 1257 (E.D. Wis.1972), *affd.,* 474 F.2d 1351 (7th Cir. 1973), *vacated and remanded on other grounds,* 416 U.S. 932, 94 S.Ct. 1927, 40 L.Ed.2d 283 (1974) and that courts may not "dictate which practices are or are not required in a particular religion." *Geller v. Secretary of Defense,* 423 F.Supp. 16, 17 (D.D.C.1976). *See Thomas,* 450 U.S. at 715– 16, 101 S.Ct. at 1430–1431; *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 708–20, 96 S.Ct. 2372, 2380–2385, 49 L.Ed.2d 151 (1976). These principles, however, are not contrary to *Sequoyah's* analysis. Far from requiring judicial evaluation of religious doctrine, *Sequoyah* focuses inquiry solely upon the importance of the geographic site in question to the practice of the plaintiffs' religion. If the plaintiffs cannot demonstrate that the government land at issue is indispensable to some religious practice, whether or not central to their religion, they have not justified a First Amendment claim. We agree with

would violate the Establishment Clause. Ruling as it did, the Tenth Circuit never considered in detail whether the Free Exercise Clause can create a right to restrict government land use. The decision in *Badoni* therefore offers little guidance here. In *Crow v. Gullet,* 541 F.Supp. 785 (D.S.D.1982), a class action on behalf of the Lakota and Tsistsistas nations, and Lakota and Tsistsistas religious practitioners, the plaintiffs objected to certain construction projects and park regulations at the Bear Butte State Park in South Dakota. The plaintiffs alleged, *inter alia,* that Bear Butte was a significant site in their religions that would be desecrated by the access roads, parking lot, and viewing platforms that the state had built or was planning to build. The district court denied relief, holding that "the free exercise clause places a duty upon a state to keep from prohibiting religious acts, not to provide the means or the environment for carrying them out." 541 F.Supp. at 791. It is uncertain, however, whether the court believed that the Free Exercise Clause can *never* restrict government land use, since the court specifically noted that the plaintiffs had "failed to establish that particular religious practices were dam-

aged by the construction." *Id.* In *Inupiat Community of Arctic Slope v. United States,* 548 F.Supp. 182, 188–89 (D.Alaska 1982), the Inupiat people of Alaska brought suit to quiet title to portions of the Beaufort and Chukchi Seas in which the United States had issued oil leases. The plaintiffs claimed, *inter alia,* that development would burden their right freely to practice their religion. The court rejected the plaintiffs' claim, finding that the plaintiffs had failed to show impairment of their religious practices, that the government had a compelling interest in developing energy resources, and that the Establishment Clause in any event barred relief. Finally, in *Northwest Indian Cemetery Protective Assoc. v. Peterson,* 552 F.Supp. 951 (N.D.Cal.1982), the plaintiffs, claiming that their religious activities would be disrupted, sought to enjoin the Forest Service from approving construction of a road upon land sacred to several Northwest Indian tribes. The court held for the defendants, and stated that the First Amendment does not obligate the government "to control or limit public access to public lands in order to facilitate" religious practices. 552 F.Supp. at 954.

*Sequoyah's* resolution of the conflict between the government's property rights and duties of public management, and a plaintiff's constitutional right freely to practice his religion. We thus hold that plaintiffs seeking to restrict government land use in the name of religious freedom must, at a minimum, demonstrate that the government's proposed land use would impair a religious practice that could not be performed at any other site.[5]

The plaintiffs argue that their proof establishes a denial of First Amendment rights even under the above standard. They rely principally upon the affidavits submitted by Hopi and Navajo religious practitioners, which establish that ceremonies conducted upon the Peaks are indispensable to the plaintiffs' religions; that ceremonial objects must be collected from the Peaks to be effective; that some ceremonial objects and medicinal herbs are collected from the Snow Bowl, and that expansion of the ski area could make those objects and herbs more difficult to find; that ceremonies and prayers have occasionally been conducted in the Snow Bowl, but that expansion of the ski area will destroy the natural conditions necessary for prayers and ceremonies to be effective; and that the mountain as a whole, and not just parts thereof, is considered sacred.

The plaintiffs' affidavits, together with other evidence in the record, establish the indispensability of the Peaks to the practice of the plaintiffs' religions. The Forest Service, however, has not denied the plaintiffs access to the Peaks, but instead permits them free entry onto the Peaks and does not interfere with their ceremonies or the collection of ceremonial objects. At the same time, the evidence does not show the indispensability of that small portion of the Peaks encompassed by the Snow Bowl permit area. The plaintiffs have not proven that expansion of the ski area will prevent them from performing ceremonies or collecting objects that can be performed or collected in the Snow Bowl but nowhere else. The record evidence is, in fact, to the contrary. The Forest Service's Final Environmental Statement found, on the basis of comments submitted by Hopi and Navajo practitioners, that "religious practices, including collecting plant materials, may occur in many locations on the sacred mountain." The government submitted affidavits from two experts on Hopi and Navajo religion. One expert stated that expansion of the Snow Bowl should have little "direct" impact on the plaintiffs' religious practices; the other stated with respect to Hopi practices that "(g)uarantee of access to the mountain should permit the continuation of all essential ritual practices," and with respect to Navajo practices that "(n)o ceremonial items . . . are found only in the permit area." It must be remembered that the Snow Bowl permit area comprises only 777 of the 75,000 acres of the Peaks, and

5. We do not hold that such proof necessarily would establish a burden on free exercise. Instead, we hold only that the First Amendment requires, at a minimum, proof that the religious practice could not be performed at any site *other than that to be developed.* Because we agree with Judge Richey that the plaintiffs have not satisfied this minimum burden of proof, we need not consider what, if any, additional factors are necessary to establish a free exercise burden. At the same time, we decline to follow those cases which have placed primary reliance upon the government's property interest and which have held, apparently, that the Free Exercise Clause can never supersede the government's ownership rights and duties of public management. *See Crow v. Gullet,* 541 F.Supp. 785, 791 (D.S.D.1982); *Northwest Indian Protective Cemetery Assoc. v. Peterson,* 552 F.Supp. 951, 954 (N.D.Cal.1982). The government must manage its land in accordance with the constitution, *Badoni v. Higginson,* 638 F.2d 172, 176 (10th Cir.1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed.2d 695 (1981); *Sequoyah v. TVA,* 620 F.2d 1159, 1164 (6th Cir.1980), *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980), which nowhere suggests that the Free Exercise Clause is inapplicable to government land. This is not to say that the government's property rights, and its duty to manage its land for the public benefit, have no bearing upon the free exercise analysis. In holding that government land uses can never burden the right to freedom of belief, and can burden the right to freedom of practice only if site-specific religious practices are significantly impaired, we pay due regard to the government's rights and duties in its land. However, we see no basis for completely exempting government land use from the Free Exercise Clause.

that prior construction on the Peaks has not prevented the plaintiffs from practicing their religions.[6] Judge Richey found that "the Snow Bowl operation has been in existence for nearly fifty years and it appears that plaintiffs' religious practices and beliefs have managed to coexist with the diverse developments that have occurred there." (footnote omitted). The plaintiffs simply have not demonstrated that development will prevent them from engaging in any religious practices.[7]

As the plaintiffs have not shown that development will burden them in their religious beliefs or practices, we need not decide whether the ski area expansion is a compelling governmental interest, or whether the Preferred Alternative is the least restrictive means of achieving that interest.

2. *American Indian Religious Freedom Act.*

■ The American Indian Religious Freedom Act, 42 U.S.C. § 1996 (Supp. IV 1980) (AIRFA), provides:

On and after August 11, 1978 it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

The plaintiffs contend that AIRFA proscribes all federal land uses that conflict or interfere with traditional Indian religious beliefs or practices, unless such uses are justified by compelling governmental interests. They argue that the Snow Bowl ski resort expansion is not a compelling governmental interest, and is accordingly proscribed by AIRFA. Judge Richey refused to give AIRFA the broad reading urged by plaintiffs. He found that AIRFA requires federal agencies to evaluate their policies and procedures with the aim of protecting Indian religious freedom, to refrain from

---

**6.** Among the structures currently on the Peaks are natural gas, telephone, and electric transmission lines, water tanks for stock, unpaved roads, and the present Snow Bowl ski resort. Cinder extraction and mining have been conducted on the Peaks for at least the past 30 years.

**7.** The plaintiffs urge that Judge Richey erred in granting the defendants summary judgment because material issues of fact were in dispute. They argue that when Judge Richey granted summary judgment the parties still disputed the effect development would have upon the plaintiffs' religions. We conclude, however, that in light of the case's procedural posture judgment was properly granted. On May 20, 1981, the parties filed with the district court a Joint Stipulation of Material Acts (supplemented on June 1, 1981). Although the stipulated facts did not dispose of one crucial factual issue—the indispensability of the permit area to the practice of the plaintiffs' religions—they did establish many of the principal facts underlying the plaintiffs' claim. The parties supplemented the stipulated facts with numerous affidavits concerning the religious significance of the Snow Bowl. The parties filed with their affidavits cross-motions for summary judgment which were argued before Judge Richey. When Judge Richey asked counsel for the Hopis whether the plaintiffs had "any reservations

about the Court deciding this on the merits by virtue of stipulation and the affidavits," he replied, "Not at all, Your Honor." We thus find that the plaintiffs agreed to the disposition of this claim on the written record. As the Ninth Circuit stated in *Gillespie v. Norris,* 231 F.2d 881, 883–84 (9th Cir.1956):

Now, while summary judgment cannot be granted where there are questions of fact to be disposed of, even by consent of all concerned, there is no reason why parties cannot agree to try a case upon affidavits, admissions and agreed documents. In effect, that is what was done here. No objection whatever was made at the time of submission that there were questions of fact which could not be decided upon the evidence before the trial court.

*Accord, Starsky v. Williams,* 512 F.2d 109, 111–13 (9th Cir.1975). Upon his review of the written record, Judge Richey found that the plaintiffs had not "shown that the permit area of the San Francisco Peaks is central or indispensable to their religion." This finding is not clearly erroneous and, indeed, is not significantly refuted by any evidence in the record. We must emphasize that evidence that all of San Francisco Peaks, including the Snow Bowl, is sacred, does not establish the indispensability of the permit area.

prohibiting access, possession and use of religious objects and the performance of religious ceremonies, and to consult with Indian organizations in regard to proposed actions, but that AIRFA does not require "Native traditional religious considerations always [to] prevail to the exclusion of all else." We agree. Judge Richey's interpretation of AIRFA [8] is fully supported by the legislative history, and the record supports his finding of Forest Service compliance.

AIRFA affirms the protection and preservation of traditional Indian religions as a policy of the United States, but the statutory language does not indicate the extent to which Congress intended that policy to override other land use considerations. We therefore look for guidance to the legislative history, and, in particular, to the substantially identical committee reports prepared by the Senate Select Committee on Indian Affairs and the House Committee on Interior and Insular Affairs. These reports reveal that in AIRFA Congress addressed the unwarranted and often unintended intrusions upon Indian religious practices resulting from federal officials' ignorance and the inflexible enforcement of laws and regulations which, though intended to achieve valid secular goals, had directly affected Indian religious practices. The reports identify three areas of concern: (1) denial of access to religious sites; (2) restrictions on the possession of such substances as peyote; and (3) actual interference with religious events. The federal government, the reports note, had sometimes denied Indians access to religious sites on federal land; had failed to accommodate such federal statutes as the drug and endangered species laws to the Indians' religious needs, and had itself interfered, or permitted others to interfere, with religious observances. *See* S.Rep. No. 709, 95th Cong., 2d Sess. 2–4; H.R.Rep. No. 1308, 95th Cong., 2d Sess. 2–3, *reprinted in* 1978 U.S.Code Cong. & Ad.News 1262, 1263–64. Thus, the House Report stated that the

purpose of AIRFA is "to insure that the policies and procedures of various Federal agencies, as they may impact upon the exercise of traditional Indian religious practices, are brought into compliance with the constitutional injunction that Congress shall make no laws abridging the free exercise of religion." H.R.Rep. No. 1308, *supra,* at 1, 1978 U.S.Code Cong. & Ad.News at 1262.

It is clear from the reports, and from the statutory preamble, that AIRFA requires federal agencies to learn about, and to avoid unnecessary interference with, traditional Indian religious practices. Agencies must evaluate their policies and procedures in light of the Act's purpose, and ordinarily should consult Indian leaders before approving a project likely to affect religious practices. AIRFA does not, however, declare the protection of Indian religions to be an overriding federal policy, or grant Indian religious practitioners a veto on agency action. "The clear intent of [AIRFA]," the Senate report states, "is to insure for traditional native religions the same rights of free exercise enjoyed by more powerful religions. However, it is in no way intended to provide Indian religions with a more favorable status than other religions, only to insure that the U.S. Government treats them equally." S.Rep. No. 709, *supra,* at 6. The comments made during debate by Representative Udall of Arizona, the chairman of the Interior and Insular Affairs Committee and the sponsor of the House bill, similarly indicate that AIRFA does not supersede the many laws under which federal lands are managed for the public good. Representative Udall stated:

> Mr. Speaker, it is not the intent of my bill to wipe out laws passed for the benefit of the general public or to confer special religious rights on Indians.
>
> \*     \*     \*     \*     \*     \*
>
> Mr. Speaker, I have received a letter from Assistant Attorney General Patricia M. Wald which . . . states that it is the

---

**8.** Judge Richey's decision marked the first judicial interpretation of AIRFA. Courts in only two other circuits have since construed AIRFA, and both followed Judge Richey's interpreta-

tion. *Northwest Indian Cemetery Protective Assoc. v. Peterson,* 552 F.Supp. 951, 954 (N.D. Cal.1982); *Crow v. Gullet,* 541 F.Supp. 785, 793–94 (D.S.D.1982).

Department's understanding that this resolution, in and of itself, does not change any existing State or Federal law. That, of course, is the committee's understanding and intent.

124 Cong.Rec. 21,444 (1978).

All this simple little resolution says to the Forest Service, to the Park Service, to the managers of public lands is that if there is a place where Indians traditionally congregate to hold one of their rites and ceremonies, let them come on unless there is some overriding reason why they should not.

\* \* \* \* \* \*

(The resolution) simply says to our managers of public lands that they ought to be encouraged to use these places. It has no teeth in it. It is the sense of the Congress.

*Id.* at 21,445.

Thus AIRFA requires federal agencies to consider, but not necessarily to defer to, Indian religious values. It does not prohibit agencies from adopting all land uses that conflict with traditional Indian religious beliefs or practices. Instead, an agency undertaking a land use project will be in compliance with AIRFA if, in the decision-making process, it obtains and considers the views of Indian leaders, and if, in project implementation, it avoids unnecessary interference with Indian religious practices. This court's recent decision in *New Mexico Navajo Ranchers Assoc. v. ICC,* 702 F.2d 227 (D.C.Cir.1983) (per curiam), indicates that agencies will not be permitted to ignore their AIRFA duties. There, this court remanded for further consideration the ICC's approval of a rail line to be built across northwestern New Mexico because the ICC had failed properly to consider, *inter alia,* evidence that the railroad permittee would not fulfill its promise to protect Navajo sacred sites along the right-of-way.

Finally, we find that the Forest Service complied with AIRFA in the present case. Before approving the Preferred Alternative the Forest Service held many meetings with Indian religious practitioners and conducted public hearings on the Hopi and Navajo reservations at which practitioners testified. The views there expressed were discussed at length in the Final Environmental Statement and were given due consideration in the evaluation of the alternative development schemes proposed for the Snow Bowl. Development of the Snow Bowl under the Preferred Alternative will not deny the plaintiffs access to the Peaks, nor will it prevent them from collecting religious objects. The Forest Service has not burdened the plaintiffs' religious practices in any manner prohibited by AIRFA.

3. *Establishment Clause.*

Judge Richey held that to grant the plaintiffs the relief they request would violate the Establishment Clause of the First Amendment. We think it unnecessary to reach that issue. As neither the Free Exercise Clause nor AIRFA entitles the plaintiffs to relief, we have no reason to consider whether relief is barred by a separate constitutional provision. We note, moreover, that where governmental action violates the Free Exercise Clause, the Establishment Clause ordinarily does not bar judicial relief. *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 220–21 & 234 n. 22, 92 S.Ct. 1526, 1535–1536, & 1542 n. 22, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 409, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965 (1963).

4. *Endangered Species Act.*

The plaintiffs claim that the Forest Service violated section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2) (Supp. IV. 1980), by failing to insure that the Preferred Alternative will not be likely to jeopardize the continued existence on the Peaks of a small yellow-flowered plant called *senecio franciscanus,* or the "San Francisco Peaks groundsel." *Senecio franciscanus* exists only in an elongated area of approximately 2.6 square kilometers at the top of the Peaks. This elongated area extends into the Snow Bowl permit area. As an alpine plant, *senecio franciscanus* is particularly susceptible to damage from human activity. The plant's population, once re-

duced by human activity, would not recover for decades or even centuries. The approved development will extend into a small portion of the plant's habitat and will destroy a small number of plants. The greatest threat to the plant's continued existence, however, is posed not by construction, or by skiers, but by summer hikers who walk off-trail and trample the fragile plants. Expansion of the ski lifts will significantly increase the threat to the plant by allowing a greater number of hikers to reach its habitat.

On June 16, 1976 the Secretary of the Interior proposed *senecio franciscanus* for formal listing as an endangered species under section 4 of the Endangered Species Act of 1973, 16 U.S.C. § 1533. Section 4 requires the Secretary to publish in the Federal Register a list of those species determined by him or by the Secretary of Commerce to be endangered or threatened within the meaning of the Act. The Endangered Species Act amendments of 1978 required the withdrawal of all listing proposals over two years old. A one year grace period was extended to proposals already over two years old. On December 10, 1979 the Secretary withdrew the proposal to list *senecio franciscanus* because no action had been taken on the proposal since its submission. At the time the plaintiffs commenced this suit *senecio franciscanus* was neither listed nor proposed for listing.

Section 7(a)(2) of the Endangered Species Act requires each federal agency, with the assistance of the Secretary, to insure that its actions are not likely to jeopardize the continued existence of any endangered or threatened species. Section 7(a)(2) provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered

species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical ... In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

■ Section 7(a)(2) requires an agency, prior to project implementation, formally to consult the Secretary about any agency action that might affect a protected species. Section 7(b), 16 U.S.C. § 1536(b), requires the Secretary to provide to an agency that consults him under section 7(a)(2) a written opinion indicating how the agency's proposed action would affect the protected species and identifying means of protecting the species. The Forest Service has not formally consulted the Secretary about *senecio franciscanus,* and it has not obtained the written opinion required by section 7(b). The plaintiffs' claim would therefore have merit if section 7(a)(2) in fact protected *senecio franciscanus.* We, however, agree with Judge Richey, who held that § 7(a)(2) applies only to species listed pursuant to section 4, and hence had no application to the unlisted *senecio franciscanus.*

To support their argument that § 7(a)(2) protects all endangered or threatened species, whether or not listed, the plaintiffs make four principal points. First, they point out that § 7(a)(2) refers to "*any* endangered species or threatened species," (emphasis supplied), and does not, unlike many other sections of Act, *see, e.g.,* §§ 7(a)(1), (c)(1), 16 U.S.C. §§ 1536(a)(1), (c)(1), specifically refer to species which are "listed" or "proposed to be listed." Second, they note that § 7(a)(2)'s reference to "endangered ... or threatened species" does not incorporate a listing requirement because the statutory definitions of "endangered species" and "threatened species" do not mention listing.[9] Third, they draw at-

---

**9.** 16 U.S.C. § 1532(6) defines "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range other than [certain insects]."

16 U.S.C. § 1532(20) defines "threatened species" as "any species which is likely to become an endangered species within the foreseeable

tention to the difference between the 1973 and the 1978 versions of section 7. As enacted in 1973, section 7 in a single clause required federal agencies to carry out "programs for the conservation of *endangered species and threatened species listed pursuant to section 1533*" and to insure that agency actions did not jeopardize the continued existence "of *such* endangered species and threatened species." (emphasis supplied). The 1978 amendments to the Endangered Species Act divided that clause into two sentences. In the first sentence Congress again required agencies to conduct programs for the preservation of "listed" species, and in the second sentence again required agencies to insure the continued existence of endangered and threatened species. However, the amended section 7, in contrast to the original, did not, in restricting agency action, directly or indirectly refer to "listed" species. Instead, the 1978 amendments changed the word "such" in the original statute to "any" and required agencies to insure the existence of "any endangered species or threatened species." Finally, the plaintiffs note that in 1979 both houses of Congress considered proposed amendments to the Act which, *inter alia,* would have added an explicit listing requirement to § 7(a)(2). *See* S. 1143, 96th Cong., 1st Sess. § 6(a) (1979), 125 Cong.Rec. S7557 (daily ed. June 13, 1979); H.R. 2218, 96th Cong., 1st Sess. (amendment of Rep. Breaux) § 5 (1979), 125 Cong. Rec. H9648 (daily ed. October 24, 1979). Although Congress did amend the Endangered Species Act in 1979, it did not amend § 7(a)(2) to include a specific listing requirement.

■ The plaintiffs claim that their points prove that Congress intended the 1978 amendments to extend § 7 protection

to unlisted species.[10] The legislative history, however, strongly indicates that Congress had no such intent. In its report on the 1978 amendments, the House Committee on Merchant Marine and Fisheries stated:

> The protections provided to animal and plant species threatened with extinction are activated by the listing of a species as "endangered" or "threatened."

H.R.Rep. No. 1625, 95th Cong., 2nd Sess. 5, *reprinted in* 1978 U.S.Code Cong. & Ad. News, 9453, 9455. The House report further states: "The mandate of section 7 applies once a species is listed." *Id.,* at 7, 1978 U.S.Code Cong. & Ad.News at 9458. These statements, it is true, are contained in a section of the committee report that summarizes the operation of the 1973 Act, and thus are not direct evidence of Congress' intent regarding the 1978 amendments. That portion of the committee report which does discuss the effect of the 1978 amendments, *see Id.* at 19–25, 1978 U.S.Code Cong. & Ad.News at 9469–75, however, contains no indication that in amending section 7 Congress intended to broaden its coverage to protect species not protected by the 1973 Act. Instead, Congress principally intended in amending section 7 to define procedures that would facilitate agency compliance with the section and to establish a mechanism by which agencies could, in appropriate cases, be exempted from the section. Comments made in connection with the 1979 amendments are also significant. The Committee on Merchant Marine and Fisheries states in its report on the 1979 amendments: "The mandate of section 7 applies once a species is listed or once 'critical habitat' is designated for any listed species." H.R.Rep. No. 167, 96th Cong., 1st Sess. 5, *reprinted in* 1979 U.S.Code Cong. & Ad.

future throughout all or a significant portion of its range."

**10.** The plaintiffs' final point—Congress' failure in 1979 to amend § 7(a)(2) to refer specifically to listed or proposed species—adds little to their argument. Congress in 1979 clearly believed that § 7(a)(2) applied only to listed species. *See* the discussion *infra.* Thus the proposed amendments to § 7(a)(2) were intended

not to *add* a listing requirement, but to extend § 7 protection, for the first time, to species only *proposed* for listing. Although Congress did not amend § 7(a)(2) in this respect, it did protect proposed species by adding § 7(a)(3) to the Act. *See* H.R.Conf.Rep. No. 697, 96th Cong., 1st Sess. 13, *reprinted in* 1979 U.S.Code Cong. & Ad.News 2557, 2572, 2576.

News 2557, 2561 (1979). The House Conference Report on the amendments states:

> The conferees note that the purpose of a listing proposal is to determine whether a species is endangered or threatened and should be listed as such. The protections of Section 7 should not apply until a species has been formally listed.

H.R.Conf.Rep. No. 697, 96th Cong., 1st Sess. 13, *reprinted in* 1979 U.S.Code Cong. & Ad. News 2572, 2577. We are aware that subsequent legislative history is not controlling evidence of the intent underlying previously enacted legislation. *See Consumer Product Safety Comm. v. GTE Sylvania, Inc.,* 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 2061 n. 13, 64 L.Ed.2d 766 (1980). Nonetheless, we think that the 1979 committee and conference reports are entitled to significant weight in interpreting the effect of the 1978 amendment of section 7. Those reports were close in time to the 1978 amendments, and their interpretation of amended section 7 is consistent with the view apparent from the 1978 House report.

The structure of the Endangered Species Act confirms that § 7(a)(2) applies only to listed species. Of particular significance is the central role played by the Secretary of the Interior in the administration of the Act.[11] Section 4 requires the Secretary to determine by regulation which species are endangered or threatened, to publish a list of such species, and periodically to review the list for necessary changes. Section 5, 16 U.S.C. § 1534, authorizes the Secretary to acquire land for the protection of listed species and other plants and wildlife. Section 6, 16 U.S.C. § 1535, authorizes the Secretary to enter into agreements with the states to achieve the purposes of the Act. Section 7(b), as previously noted, requires the Secretary to advise agencies that con-

sult him under § 7(a)(2) on means of protecting covered species. These provisions show that under the Act the Secretary has primary responsibility to research the status of different species, to list those species that are in need of protection, and to act for the preservation of listed species. Thus it would be anomalous to construe § 7(a)(2) as requiring each federal agency, regardless of its inexpertise in matters of environmental protection or wildlife conservation, to decide for itself whether any of the species its proposed action would affect is endangered or threatened. It is more logical to conclude that § 7(a)(2) requires an agency, in consultation with the Secretary, to assess the impact of proposed agency action upon a listed species and to develop plans for the species' protection.[12]

We also note that the plaintiffs' interpretation of § 7(a)(2) would make a nullity of § 7(a)(3), 16 U.S.C. § 1536(a)(3), which requires each agency to consult the Secretary "on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed." Section 7(d), 16 U.S.C. 1536(d), prohibits an agency, pending the completion of a § 7(a)(2) consultation about a listed species, from making any "irretrievable commitment of resources" which would foreclose the formulation or implementation of any reasonable alternative for species protection that the Secretary might suggest under § 7(b). In contrast, § 7(a)(3), concerning proposed species, explicitly states that the consultation it requires does not include the § 7(d) limitation on the commitment of resources. The plaintiffs, however, would extend § 7(a)(2) protection, including the § 7(d) limitation, to all vulnerable species, whether or not listed or proposed for listing. They would thus extend to species not proposed for

---

**11.** The Secretary of Commerce also has significant duties under the Act. Here, however, we are concerned only with the duties of the Secretary of the Interior.

**12.** The plaintiffs claim that individual federal agencies *are* qualified to decide whether the species their actions will affect are endangered or threatened. They rely upon that provision of § 7(a)(2) which states: "In fulfilling the re-

quirements of this paragraph each agency shall use the best scientific and commercial data available." That language, the plaintiffs argue, requires agencies to use the best available data to determine species status. We think it clear, however, that the quoted language serves only partially to define the nature of an agency's duties once a listed species has brought § 7(a)(2) into play.

listing greater protection than § 7(a)(3) grants to proposed species. The plaintiffs' interpretation would make irrelevant the protection afforded by § 7(a)(3) and would violate the basic rule of statutory construction that courts should, if possible, give effect to every word used by Congress. *See, e.g., Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); *Symons v. Chrysler Corp. Loan Guarantee Bd.,* 670 F.2d 238, 242 (D.C.Cir. 1981). For these reasons we conclude that to be protected under § 7(a)(2) a species must be listed under § 4.

The plaintiffs claim that if listing is required under § 7(a)(2), we should treat *senecio franciscanus* as if it were listed. They rely upon the Forest Service's recognition in the Final Environmental Statement that the Preferred Alternative threatens the plant, and upon the fact that the Fish and Wildlife Service, since at least 1976, has been aware of the plant's vulnerability. They contend that the Secretary's failure formally to list the plant since 1976 constitutes unreasonable delay and a violation of the statutory mandate "to halt and reverse the trend towards species extinction, whatever the cost." *TVA v. Hill,* 437 U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 L.Ed.2d 117 (1978). We agree with Judge Richey that there is no evidence of such bad faith or unreasonable conduct on the part of the Secretary as would warrant an injunction against the United States ordering the listing of *senecio franciscanus.*

■ On November 22, 1982, approximately one month after we heard argument, the Secretary, through the Fish and Wildlife Service, proposed *senecio franciscanus* for listing as a threatened species. 47 Fed.Reg. 52,483 (1982). Because *senecio franciscanus* is now proposed for listing, § 7(a)(3) (discussed above) requires the Forest Service to consult the Secretary about the possible impact of the Preferred Alternative upon the plant. We do not think it necessary to remand this case to the district court to insure Forest Service compliance with § 7(a)(3). Section 7(a)(3) does not incorporate the § 7(d) limitation on commit-

ment of resources and thus does not prohibit development until consultation is completed. More important, we have no reason to believe that the Forest Service has not, or will not, comply with § 7(a)(3). The record indicates that appropriate measures can be taken to minimize the danger to *senecio franciscanus.* We are confident that the Forest Service will, in good faith, implement such measures.

5. *Wilderness Act.*

■ On May 2, 1979 President Carter, on the advice of the Secretary of Agriculture, recommended to Congress that it designate as wilderness under the National Wilderness Preservation System Act of 1964, 16 U.S.C. §§ 1131–36 (1976), some 14,-650 acres of the San Francisco Peaks. Congress has not yet acted upon that recommendation. The area recommended for wilderness designation abuts the Snow Bowl permit area on the north, south, and east, but includes no part of the permit area. A substantial part of the permit area is still undeveloped; in particular, a strip of land approximately 500 feet wide along the area's northern border, adjacent to the recommended wilderness area, remains heavily forested. Under the Preferred Alternative that strip of land will be partially developed for skiing. The plaintiffs contend that the Secretary of Agriculture, in approving development of pristine land adjacent to a recommended wilderness area, infringed Congress' exclusive authority to determine wilderness area boundaries. The plaintiffs base their claim upon § 3(b) of the Wilderness Act, 16 U.S.C. § 1132(b) (1976), and argue that the Secretary may not, by authorizing expansion of the ski area, impair Congress' discretion to include undeveloped portions of the Snow Bowl in the San Francisco Peaks wilderness area. As Judge Richey found, the plaintiffs' claim is without merit.

Section 1132(b) authorizes the President to recommend for inclusion in designated wilderness areas lands contiguous to areas formerly designated as "primitive" by the Secretary of Agriculture. It provides:

The Secretary of Agriculture shall, within ten years after September 3, 1964, review, as to its suitability or nonsuitability for preservation as wilderness, each area in the national forests classified on September 3, 1964 by the Secretary of Agriculture or the Chief of the Forest Service as "primitive" and report his findings to the President. The President shall advise the United States Senate and House of Representatives of his recommendations with respect to the designation as "wilderness" or other reclassification of each area on which review has been completed ... Each recommendation of the President for designation as "wilderness" shall become effective only if so provided by an Act of Congress ... Any [primitive] area may be increased in size by the President at the time he submits his recommendations to the Congress by not more than five thousand acres with no more than one thousand two hundred and eighty acres of such increase in any one compact unit; if it is proposed to increase the size of any such area by more than five thousand acres or by more than one thousand two hundred and eighty acres in any one compact unit the increase in size shall not become effective until acted upon by Congress. *Nothing herein contained shall limit the President in proposing, as part of his recommendations to Congress, the alteration of existing boundaries of primitive areas or recommending the addition of any contiguous area of national forest lands predominantly of wilderness value.*

(emphasis supplied).

In *Parker v. United States,* 448 F.2d 793, 797 (10th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972), the Tenth Circuit held that the italicized language reflects "the clear intent of Congress ... that both the President and the Congress shall have a meaningful opportunity to add contiguous areas predominantly of wilderness value to existing primitive areas for final wilderness designation." A "meaningful opportunity" can be preserved

only if lands within the ambit of § 1132(b) remain undeveloped until such time as the President and Congress act. Thus in *Parker,* the Tenth Circuit affirmed a district court order enjoining the Secretary from authorizing lumbering of certain virgin land contiguous to a primitive area, where the President and Congress had not yet considered whether to designate the land in question as wilderness.

*Parker* indicates that § 1132(b) can restrict the Secretary's discretion to approve development of wilderness land contiguous to a designated primitive area. The defendants, however, contend that § 1132(b) does not apply to national forest land which is neither contained in nor contiguous to a primitive area, and that the plaintiffs' claim must therefore fail, as neither the Snow Bowl permit area nor any other part of the San Francisco Peaks has ever been designated primitive. We agree.

The clear focus of the statutory language is upon the Secretary's duties with respect to primitive areas. A brief review of the statute's background confirms that the statute has no broader application. In 1929 the Secretary of Agriculture, by regulation, established procedures for the designation of primitive areas in national forests. The 1929 regulation was superseded in 1939 by new regulations which authorized the Secretary of Agriculture to designate wilderness areas in excess of 100,000 acres and the Chief of the Forest Service to designate wild areas of between 5,000 and 100,000 acres. The Secretary of Agriculture then reviewed the 73 primitive areas designated between 1929 and 1939 to determine which should be designated in whole or in part as wilderness or wild areas. By 1964, when Congress considered legislation to create a statutory scheme for the protection of wilderness lands, 18 tracts of national forest land had been designated as wilderness areas, 35 as wild areas, and 34 remained in their original classification as primitive areas. *See* H.R.Rep. No. 1538, 88th Cong., 2d Sess. 7–8, *reprinted in* 1964 U.S.Code, &

Ad.News, 3615, 3616.[13]  Congress concluded that the areas designated as wilderness or wild areas had been "defined with precision," *Id.* at 3617, and could be given statutory protection immediately.  Accordingly, in § 3(a) of the Wilderness Act, 16 U.S.C. § 1132(a), Congress designated as wilderness all areas within the national forests that the Secretary of Agriculture had classified at least 30 days before September 3, 1964 as wilderness or wild.  Congress believed, however, that the primitive areas had not been "defined with precision," and that such areas "should not be considered for inclusion in the wilderness system until completion of a thorough review." *Id.*  Accordingly, in § 3(b) of the Act, 16 U.S.C. § 1132(b), Congress ordered the Secretary of Agriculture to review each designated primitive area as to its suitability for inclusion in the wilderness system.  It thus is clear from § 1132(b)'s limited purpose that the statute applies only to primitive areas and lands contiguous thereto.  Since the Snow Bowl permit area is neither contained in nor contiguous to any primitive area, the plaintiffs have no claim under § 1132(b).[14]

## 6.  *National Historic Preservation Act.*

■ In his June 15, 1981 opinion, Judge Richey found that the Forest Service had committed three violations of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470 *et seq.* (1976), and implementing regulations.  First, he found that the Forest Service had not, as required by 16 U.S.C. § 470f and Executive Order 11593,[15] examined the project area to identify properties eligible for inclusion in the National Register of Historic Places.  *See* 16 U.S.C. § 470a.  Second, he found that the Forest Service had not, as required by 36 C.F.R. § 800.4(b), consulted the Arizona State Historic Preservation Officer (SHPO) about the effect of the Preferred Alternative upon two National Register properties near the Snow Bowl—the Fern Mountain Ranch, owned by plaintiffs Jean and Richard Wilson, and the C. Hart Merriam Base Camp.  Finally, he found that the Forest Service had not, as required by 36 C.F.R. § 800.-4(a)(1), consulted the SHPO about the eligibility of the San Francisco Peaks themselves for inclusion in the National Register.  Judge Richey remanded the case to the Forest Service for compliance with NHPA, and stayed development pending compliance.  Upon remand, the Forest Service conducted archaeological surveys of the permit area and consulted the SHPO.  On September 22, 1981, the Chief Forester determined that the project area contained no properties either listed or eligible for listing on the National Register;  that expansion of the ski area would not affect the historic qualities of the Merriam Base Camp or the Fern Mountain Ranch;  and that the San Francisco Peaks themselves were not eligible for listing.  The SHPO had concurred in these findings by letter dated September 11, 1981.  After the plaintiffs failed to obtain administrative reversal of the Chief Forester's determination, the defendants returned to court to show compliance to Judge Richey.  On May 14, 1982 Judge Richey ruled that the Forest Service had com-

**13.**  Also, one area had been designated as "canoe." *Id.*

**14.**  Additionally, § 1132(b) applies only to forest land "predominantly of wilderness value." 16 U.S.C. § 1131(c) defines "wilderness" as "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation ... with the imprint of man's work substantially unnoticeable..." The permit area certainly is not wilderness under that definition.  As Judge Richey noted, the permit area contains a ski lodge and ski runs and has been partially cleared of trees.  The fact that portions of the permit area remain undeveloped cannot change the fact that the area is not "*predominantly* of wilderness value." We therefore would reject the plaintiffs' § 1132(b) claim even were the statute otherwise applicable.  The plaintiffs' reliance upon *Parker v. United States,* 309 F.Supp. 593 (D.Colo.1970), *affd.,* 448 F.2d 793 (10th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972), is misplaced.  Not only was the land at issue in that case contiguous to a designated primitive area, it also contained no development other than a short access road.

**15.**  Executive Order 11593 is reprinted in 16 U.S.C.A. § 470 (1974) at 26, and at 36 F.R. 8921 (1971).

plied with NHPA in all respects. He granted the defendants final judgment on all counts and lifted the stay against development.

The plaintiffs claim that Judge Richey erred in finding compliance with NHPA. They contend that the Forest Service's efforts to identify eligible properties in the permit area were legally insufficient; that the Preferred Alternative will affect the historic qualities of the Fern Mountain Ranch;[16] and that the San Francisco Peaks are eligible for listing. The plaintiffs' three contentions will be considered in order.

16 U.S.C. § 470f and implementing regulations, see 36 C.F.R. § 800.4(a), together with Executive Order 11593, require federal agencies approving land use projects to identify all properties within and about the project area that are eligible for listing in the National Register and that may be affected by the project. See Romero-Barcelo v. Brown, 643 F.2d 835, 859 (1st Cir.1981), reversed on other grounds, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). The specific area to be examined for eligible properties is the "area of the undertaking's potential environmental impact," 36 C.F.R. § 800.4(a), which is defined as the "geographical area within which direct and indirect effects generated by the undertaking could reasonably be expected to occur." 36 C.F.R. § 800.3(o). The agency must consult the SHPO when determining the area of potential environmental impact and the scope of surveys needed to identify eligible properties within that area. 36 C.F.R. §§ 800.3(o), 800.4(a)(1), (2). The Forest Service and the SHPO agreed that the Preferred Alternative's area of potential environmental impact included the 777 acre permit area, the Snow Bowl road, and 30–foot strips of land on both sides of the road. Forest Service and Northern Arizona University archaeologists in July, 1981 conducted archaeological surveys in which they intensively examined 272 acres, or 35% of the total permit area, including all 77 acres

proposed for development under the Preferred Alternative. The surveys revealed no evidence of Navajo or Hopi use and in fact discovered only one archaeological site—the foundation of the old Snow Bowl ski lodge that burned in 1952. The Forest Service found the lodge foundation to be ineligible for listing, and the plaintiffs do not argue to the contrary. The SHPO agreed that the surveys satisfied the Forest Service's affirmative obligation to locate and identify eligible properties in the impact area. See 36 C.F.R. § 800.4(a)(2).

The plaintiffs argue that the Forest Service breached its NHPA duty to identify *all* eligible properties by failing to survey 100% of the impact area. They contend that the Forest Service's partial surveys may have left some eligible properties undetected. We think that the partial surveys were sufficient. The regulations do not expressly require agencies in all cases completely to survey impact areas, and in fact recognize that the need for surveys will vary from case to case. See C.F.R. §§ 800.4(a)(1), (2). We believe that a complete survey is not required where both the partial survey, and all other evidence, indicate that a complete survey would be fruitless. Here, the defendants' surveys discovered neither eligible properties nor any evidence to suggest that such properties might be present in areas not surveyed. The existing literature on the San Francisco Peaks gave the Forest Service no indication of historical or archaeological sites in the impact area. Additionally, the high altitude and steep slopes of the San Francisco Peaks made the impact area an unlikely site for past human habitation and hence an unlikely place in which to find eligible properties. Under these circumstances a complete survey was not required. We find support for our conclusion in the First Circuit's decision in *Romero-Barcelo, supra,* where the Navy conducted a partial archaeological survey of the island of Vieques off the Puerto Rican coast in connection with training operations

---

**16.** The plaintiffs have on appeal dropped their claim that development will impair the historic qualities of the C. Hart Merriam Base Camp.

there to be conducted. The Navy's survey identified numerous eligible properties and suggested the probable existence of other archaeological sites not specifically located. The First Circuit held that § 470f and Executive Order 11593 required the Navy to conduct further surveys to locate the sites thought to be present. Significantly, however, the court stated that its decision did not require the Navy "to undertake a 100% survey of Vieques," or to survey parts of the island where the initial survey established "archeological sterility." 643 F.2d at 860.

As a second ground for reversal, the plaintiffs argue that the Forest Service erred in finding that the Preferred Alternative will have no effect upon the historic qualities of the Fern Mountain Ranch. Section 800.4(b) of 36 C.F.R. requires each agency, in consultation with the SHPO, to determine for each listed or eligible property within the potential environmental impact area, whether the agency project will affect the historical, archaeological, or other characteristic of the property that qualified it for inclusion in the National Register. The agency is to determine whether an effect is present according to the criteria of 36 C.F.R. § 800.3. If the agency determines that the project will have no effect, the project may proceed. 36 C.F.R. § 800.-4(b)(1). If, however, the agency determines merely that the project will have no *adverse* effect, the agency's determination must be submitted to the Advisory Council on Historic Preservation for review and comment, 36 C.F.R. § 800.4(c), and if the agency determines that there will be an adverse effect, the agency must formally consult the Council. 36 C.F.R. §§ 800.4(d), 800.6(b). The plaintiffs argue that Judge Richey erred in failing to require formal consultation under § 800.6(b). We conclude, however, that Judge Richey properly upheld the Forest Service's finding of "no effect."

The Fern Mountain Ranch is located on the western slopes of the San Francisco Peaks, approximately one and one-half miles to the north of the Snow Bowl. The Ranch provides an excellent view of the Peaks' wooded slopes, and of the permit area. Development under the Preferred Alternative will somewhat impair the Ranch's rustic setting since the new ski lifts and slopes will be readily visible from the Ranch. The plaintiffs argue that alteration of the Ranch's natural setting would constitute an "adverse effect" under the regulations. They rely upon 36 C.F.R. § 800.3(b), which defines "adverse effect" as including, *inter alia,* an "alteration of the property's surrounding environment," or the "(i)ntroduction of visual . . . or atmospheric elements that are out of character with the property." The plaintiffs' argument fails to recognize that the § 800.3 criteria are to be applied with reference only to those characteristics of the property that qualified it for National Register listing. *See* 36 C.F.R. § 800.4(b). The Ranch's natural setting is not one of the characteristics that qualified it for listing. Instead, the Nomination Form for the Ranch's listing indicates that the Ranch is historically significant for three reasons: (1) its original nineteenth-century buildings are still standing and in use; (2) it played an important role, as a rest stop, in the development of the Grand Canyon as a tourist attraction; and (3) it was the first ranch in Arizona to raise Arabian horses. Clearly, the Preferred Alternative will not affect the Ranch's three relevant characteristics and its effect upon the view from the Ranch is, under the circumstances, immaterial. The plaintiffs also argue that the Preferred Alternative will adversely effect the Ranch because the increased tourist traffic at the Snow Bowl will, they say, increase the dangers of trespassing, vandalism, and arson at the Ranch. The Forest Service, however, determined that increased use of the Snow Bowl would not endanger the Ranch. The Forest Service's determination of this factual issue is adequately supported.

The plaintiffs also argue that the Forest Service violated NHPA by finding that the San Francisco Peaks themselves were not eligible for listing. The plaintiffs rely upon the fact that several other mountains and properties which are historically significant principally because of their association with

Indian religion or culture have been listed. Those properties, however, may or may not have possessed the particular attributes of the San Francisco Peaks. The determination in each case of a property's eligibility is the responsibility of the agency and of the SHPO, *see* C.F.R. § 800.4(a)(3), and in the absence of an abuse of discretion, their application of the regulations to the facts must be sustained. We agree with Judge Richey that the plaintiffs have not shown an abuse of discretion.

Lastly, the plaintiffs argue that the Forest Service should have requested a final determination of the Peaks' eligibility from the Secretary of the Interior. Section 800.-4(a)(3) of 36 C.F.R. states that when a "question" exists as to a property's eligibility, the Secretary shall be requested to make a final determination. Section 63.2(c) of 36 C.F.R. states that a "question" exists "when the agency and the State Historic Preservation Officer disagree or when the agency determines that a question exists." Here, the Forest Service and the SHPO agreed that the Peaks were not eligible, and the Forest Service did not otherwise determine that a question existed. The plaintiffs' argument that a question existed because the Forest Service and the SHPO relied upon different reasoning in reaching their identical conclusions has no merit. Section 800.-4(a)(3), as clarified by § 63.2(c), is obviously intended not to require the agency and the SHPO to reason alike, but only to resolve disputes between the two, and to provide a means by which the Secretary can have the final say on properties of uncertain status.

7. *Land Use Permits.*

In 1977 the Forest Service issued two permits to Northland for use of the Snow Bowl permit area, which on May 18, 1982 were amended to reflect the development approved under the Preferred Alternative. One of the amended permits, covering 24 acres, is a term permit valid until May 1, 1997. The Forest Service granted this permit under the Act of March 4, 1915, as amended, 16 U.S.C. § 497 (1976), which provides:

The Secretary of Agriculture is authorized, under such regulations as he may make and upon such terms and conditions as he may deem proper, (a) to permit the use and occupancy of suitable areas of land within the national forests, not exceeding eighty acres and for periods not exceeding thirty years, for the purpose of constructing or maintaining hotels, resorts, and any other structures or facilities necessary or desirable for recreation, public convenience, or safety; ...

Northland will build the ski lodge and all other permanent facilities upon the land covered by the term permit. The other permit, an annual or revocable permit covering the remaining 753 acres of the permit area, was issued by the Forest Service under the authority of the Act of June 4, 1897, as amended, 16 U.S.C. § 551 (1976), which authorizes the Secretary of Agriculture to "make such rules and regulations ... as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." The land covered by the revocable permit will be used only for ski slopes.

The plaintiffs challenge the validity of the "dual permit" system employed by the Forest Service. They contend that 16 U.S.C. § 497, which authorizes permit areas no larger than 80 acres, constitutes the sole authority under which the Secretary may grant permits for the private recreational development of national forest lands. They accordingly claim that the Forest Service exceeded its authority in issuing a revocable permit under 16 U.S.C. § 551 and in granting permits covering 777 acres to a single developer. We agree with Judge Richey that § 497 does not limit the Secretary's authority under § 551 and that Congress has sanctioned the use of dual permits.

In 1905 Congress transferred the management of the national forests from the Secretary of the Interior to the Secretary of Agriculture. Act Feb. 1, 1905, c. 288, § 1, 33 Stat. 628. As early as May 31, 1905 the Attorney General informed the Secretary of Agriculture that the Act of 1897, as amend-

ed, authorized him to grant revocable permits for the private, commercial use of national forest land. 25 Op.Atty.Gen. 470 (1905). The Secretary of Agriculture thereafter routinely granted revocable permits for many purposes, including summer houses and camping grounds, under the 1897 Act. In 1911 the Supreme Court upheld the authority of the Secretary to grant revocable grazing permits under the Act. *United States v. Grimaud,* 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911).

In 1915 Congress enacted legislation, now § 497, which, in contrast to the Act of 1897, expressly authorized the Secretary of Agriculture to grant private permits to national forest land. The 1915 Act authorized the Secretary to grant term permits to areas not larger than five acres for periods not exceeding 30 years. The plaintiffs claim that the 1915 Congress intended to repeal whatever permit authority the Secretary possessed under the 1897 Act. The plaintiffs' argument has no support in the legislative history, which instead suggests that Congress acted not to repeal the Secretary's existing powers, but to enable him, for the first time, to grant long-term permits. The Congress recognized that the permanent structures necessary for recreational use of the national forests would not be built unless private parties could obtain secure tenure. Congressman Hawley, the sponsor of the House bill, stated:

At present the people have an unlimited right to go upon the public land in the national forests. They can go there and build a temporary camp, put up a tent or a little camp of some kind. They are given now by the Secretary of Agriculture permission to construct temporary structures. But it does not enable them to put up any important building, or to justify any considerable expenditure. But if they could get permission for a period of years they can afford to put up a better building(.)

52 Cong.Rec. 1787 (1915). Significantly, the Congress had before it a letter from the Secretary of Agriculture which discussed the Secretary's practice of granting revocable permits under the 1897 Act.[17] The letter stated:

There is at the present time some hesitancy on the part of persons who want to use national-forest land upon which to construct summer residences, hotels, stores, and other structures involving a large expenditure, because of *the indefinite tenure of the permits to them which the present law provides for.* At the present time, however, *there are several thousand such permits in use,* upon which structures have been erected. In justice to those who desire to construct more substantial improvements, it is believed that the present law should be amended to give persons a better right than the *revocable permit now authorized.*

(emphasis supplied). We must therefore presume that when Congress acted in 1915 it had knowledge of the Secretary's practice under the 1897 Act. Accordingly, the absence in the Act and in the legislative history of any language expressly repudiating the Secretary's practice is strong evidence that Congress did not intend the 1915 Act to affect the Secretary's power to issue revocable permits. Certainly the plaintiffs have shown no reason to depart from the settled rule disfavoring repeal by implication. *See Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981).

We conclude, therefore, that the 1915 Act neither limited the Secretary's power to issue revocable permits to areas larger than five acres nor prohibited him from issuing revocable and term permits simultaneously. Our conclusion is reinforced by Congress' awareness of, but failure to repudiate, the continuing practice of the Forest Service after 1915 to issue revocable permits under the 1897 Act. The Forest Service, following the 1915 Act, believed that the purposes of the Act could not be achieved unless it

17. The letter was both included in the House committee report, H.R.Rep. No. 1023, 63d Cong., 2d Sess. 2 (1915), and read during debate by Congressman Hawley. 52 Cong.Rec. 1787 (1915).

had authority to issue term permits to areas larger than five acres. Congress in the 1930's and 1940's considered several bills that would have expanded the Forest Service's authority to grant term permits, but enacted none of them. These bills are nonetheless significant because the reports they generated gave Congress clear notice that the Forest Service was continuing to issue revocable permits for recreational uses, and further, was issuing dual permits. For example, the Senate report on S. 773 (72nd Cong., 1st Sess. (1932)), contains a letter from the Secretary of Agriculture to the Chairman of the Committee on Agriculture and Forestry, which states:

> The general laws relating to the national forests do not authorize the issuance of permits *other than terminable at the discretion of the Secretary of Agriculture.* One act, that of March 4, 1915 . . . authorizes the issuance of permits for not to exceed 30 years and for areas of not to exceed 5 acres . . . Experience has proved that 5 acres is insufficient to permit of the proper development of the most modern types of outdoor camps, hotels, resorts, sanitoria, etc., which, in addition to the principal structures, usually require the related use of lands for the various necessary utilities, recreational services, etc., now regarded as essential to such services. *At present these are provided by the issuance of supplemental terminable permits,* which inject an undesirable element of uncertainty of tenure and add to routine requirements of administration.

S.Rep. No. 754, 72d Cong., 1st Sess. 2 (1932) (emphasis supplied). Similarly, in connection with H.R. 1809 (80th Cong., 1st Sess. (1948)), the Acting Secretary of Agriculture

sent the Chairman of the Committee on Agriculture a letter, which stated:

> Of course, the large majority of . . . permitted uses [in the national forests] are of relatively short duration or entail only small capital investments. In such circumstances *the type of terminable permit, renewable from year to year, which this Department is authorized to issue without limitation as to character of use or area,* is adequate.

H.R.Rep. No. 805, 80th Cong., 1st Sess. 2 (1948) U.S.Code Cong. & Admin.News, pp. 1337, 1338 (emphasis supplied).[18]

In 1956 Congress finally amended the 1915 Act to grant the Secretary broader power to issue term permits. The amendment increased the acreage limitation in § 497 from five acres to 80 because effective recreational development of the national forests had been stymied by the five-acre limitation on term permits. *See* H.R.Rep. No. 2792, 84th Cong., 2d Sess., *reprinted in* 1956 U.S.Code Cong. & Ad.News 3634. The committee reports, far from repudiating the Secretary's practice of issuing revocable permits, expressly approved the practice:

> The Department of Agriculture now has adequate authority to issue revocable permits for *all* purposes under the act of June 4, 1897 (16 U.S.C. § 551). Its authority to issue term permits . . . would be broadened by S. 2216(.)

S.Rep. No. 2511, 84th Cong., 2d Sess. 1, (emphasis supplied), *quoted in* H.R.Rep. No. 2792, *supra*, at 2, 1956 U.S.Code Cong. & Ad.News at 3635. Congress has not amended either § 497 or § 551 in relevant part since 1956.

---

**18.** H.R. 1809, as originally proposed, would have authorized the Secretary to grant term permits to areas not larger than 80 acres for periods not exceeding 30 years in all of the national forests. The House Committee on Agriculture amended the bill to apply only to Alaskan national forests, because it believed that broadening the Secretary's powers as to other national forests might have undesirable results. *See* H.R.Rep. No. 805, 80th Cong., 1st Sess. 1 (1948). The bill passed as amended. 16 U.S.C. § 497a (1976). The plaintiffs argue

that the amendment to H.R. 1809 reflects Congress' intent not to allow the Secretary to issue permits to large areas in the lower 48 states. The better interpretation, however, is that Congress was not yet ready to authorize the Secretary to grant *term* permits to areas larger than 5 acres. The legislative history of H.R. 1809 nowhere disapproves of the Secretary's practice of issuing dual permits and revocable permits to areas larger than 5 acres. As the quoted letter illustrates, Congress knew of that practice.

We conclude, then, that the Secretary has consistently interpreted the Act of 1915 as *not* limiting his authority to issue revocable permits under the Act of 1897; that Congress has for decades had knowledge of the Secretary's interpretation, but has never objected; and that on the one occasion when Congress did comment on the Secretary's interpretation and practice, in 1956, it expressed approval. Under these circumstances the Secretary's authority to issue revocable permits under § 551, whether or not exercised in connection with dual permits, cannot be doubted. As this court stated in *Kay v. FCC,* 443 F.2d 638, 646–47 (1970), "a consistent administrative interpretation of a statute, shown clearly to have been brought to the attention of Congress and not changed by it, is almost conclusive evidence that the interpretation has congressional approval." (footnote omitted).

In *Sierra Club v. Hickel,* 433 F.2d 24, 35 (9th Cir.1970), *affd. on other grounds sub nom. Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the Ninth Circuit approved the practice of issuing dual permits to ski resort operators [19] and, in language highly instructive here, stated:

> The fact that the record discloses that there are now a total of at least eighty-four recreational developments on national forest lands in which there is such a combination of the term permit and the revocable permit is convincing proof of their legality. Many of these developments are ski developments making use of the maximum acres of the term permit plus revocable permits for additional acreage in amounts in some cases in excess of 6,000 acres ... It seems apparent, as was obvious to both [the 1956] Senate and House Committees, that the eighty-acre long-term permit was a necessity to obtain proper financing for substantial permanent improvements, while developments of less magnitude and permanency, such as trails, slopes, corrals, could be placed upon lands held under revocable permits.

(footnote omitted). The Forest Service has continued, following the decision in *Sierra Club,* to grant dual permits to ski resort operators. There are presently about 200 ski developments in the national forests and most of them employ dual permits.[20]

The case of *Wilderness Society v. Morton,* 479 F.2d 842 (D.C.Cir.) (en banc), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973), cited by the plaintiffs, does not support their argument. In *Wilderness Society,* the plaintiffs challenged the issuance of rights-of-way and special land use permits by the Secretary of the Interior to a consortium of oil companies for the construction of the Alaska pipeline. The permits covered land greater in width than the express limitation contained in § 28 of the Mineral Leasing Act of 1920, 30 U.S.C. § 185. This court found that § 28 constituted the Secretary's sole authority to issue permits for the use of federal land for oil pipelines, and held that the Secretary had exceeded his authority in failing to adhere to the width limitations. The plaintiffs also contended that the permits issued by the Secretary violated § 497. The court found it unnecessary to decide that claim, and declined to comment on the Ninth Circuit's decision in *Sierra Club.* The court did, however, note that § 497 had "no provision comparable to that in Section 28 of the Mineral Leasing Act expressly stating that no rights-of-way for the uses in question shall be granted except under the provisions, conditions and limitations of the stat-

19. *Sierra Club* vacated a preliminary injunction enjoining the Secretaries of Interior and Agriculture from authorizing a large-scale, private recreational development in the Sequoia National Forest. Because *Sierra Club* involved an interlocutory appeal it required the Ninth Circuit to decide only whether the plaintiffs had shown a strong likelihood of success on the merits. Although the Ninth Circuit found that the plaintiffs had shown little or no likelihood of success, it did not make a final determination of the validity of dual permits. That issue therefore technically remains open in the Ninth Circuit. *See Sierra Club v. Morton,* 348 F.Supp. 219, 220 (N.D.Cal.1972). *Sierra Club* did, however, give detailed consideration to the legality of dual permits.

20. S.Rep.No. 1019, 94th Cong., 2d Sess. 8 (1976).

ute." 479 F.2d at 870. That distinction between the language of § 497 and of § 28, together with the legislative history recounted above, indicate clearly enough that § 497, unlike § 28, cannot be read as an exclusive grant of authority as to the uses in question.[21]

Finally, the plaintiffs claim that even if the Secretary had authority under §§ 497 and 551 to issue dual permits to Northland, the 753-acre permit issued under § 551 is invalid because not actually revocable. We see no merit in this claim. The Forest Service's continuing power to revoke the § 551 permit is apparent from the permit's terms, which state that the permit will terminate on May 1, 1997 unless previously terminated "upon breach of any of the conditions herein *or at the discretion of the regional forester or the Chief, Forest Service.*" (emphasis supplied). The plaintiffs argue that the permit is not truly revocable because the Forest Service's own regulations require a rational basis for the revocation of such permits, *see* 36 C.F.R. § 251.-60(b) (1982), and subject revocations to administrative review. 36 C.F.R. § 211.19 (1982). The plaintiffs have not, however, cited any authority holding that a permit, to be "revocable," must be revocable at the mere arbitrary will of the issuing authority, and we decline to read such a requirement into the authorizing statute. *Cf. Sierra Club, supra,* 433 F.2d at 35. The plaintiffs also argue that the permit is not revocable because the Forest Service is unlikely to revoke it before the term permit expires. The short answer is that the Forest Service has power to revoke.

### CONCLUSION

We also agree with Judge Richey's disposition of the plaintiffs' remaining claims.

Accordingly, we affirm the judgment of the district court.

21. In both 1975 and 1977 the Senate considered bills which would have substantially revised the Forest Service's authority to issue permits for the private recreational use of national forest land. The bills expressly authorized the Forest Service to grant term permits to ski resort operators to areas larger than 80 acres. S. 1338, 95th Cong., 1st Sess. § 3, 123 Cong. Rec. 11,643 (1977); S. 2125, 94th Cong., 2d Sess. § 3 (1976). The bills never became law. Although the bills were intended to achieve a number of goals, they were proposed, in part, because of concern that under *Wilderness Society v. Morton* the Forest Service's practice of issuing dual permits might be illegal. *See* 123 Cong.Rec. 11,641 (1977) (Remarks of Sen. Haskell); S.Rep. No. 324, 95th Cong., 1st Sess. 11–12 (1977); S.Rep. No. 1019, 94th Cong., 2d Sess. 8–9 (1976). However, as stated above, *Wilderness Society* does not preclude the issuance of dual permits under §§ 497 and 551.