NEW MEXICO NAVAJO RANCHERS ASSOCIATION, Martin Martinez, and Pueblo Pintado Chapter, Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and the United States of America, Respondents,

Star Lake Railroad Company, et al., Intervenors.

No. 81–1534.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 18, 1982.

Decided March 1, 1983.

Paul E. Frye, Crownpoint, N.M., with whom Eric D. Eberhard, Placitas, N.M., was on the brief for petitioners, New Mexico Navajo Ranchers Ass'n, et al. and intervenors Torreon Chapter, et al. Dan Press, Window Rock, Ariz., also entered an appearance for petitioners.

John J. McCarthy, Jr., Atty., I.C.C., Washington, D.C., for respondents. John Broadley, General Counsel, Henri F. Rush, Associate General Counsel, Cecelia E. Higgins, Atty., I.C.C., John J. Powers, III and Kenneth P. Kolson, Attorneys, Dept. of Justice, Washington, D.C., were on the brief for respondents. Daniel B. Harrell, Richard A. Allen and Ellen K. Schall, Attys., I.C.C. and James H. Laskey, Attorney, Dept. of Justice, Washington, D.C., also entered appearances for respondents.

R. Eden Martin, Washington, D.C., with whom Lawrence A. Miller and Ronald S. Flagg, Washington, D.C., were on the brief for intervenors, Star Lake Railroad Company, et al. Ann L. Rieck, Washington, D.C., also entered an appearance for intervenors.

Before EDWARDS and BORK, Circuit Judges, LUMBARD *, Senior Circuit Judge.

Opinion PER CURIAM.

PER CURIAM:

Petitioners here challenge the Interstate Commerce Commission's grant to Star Lake Railroad Company ("Star Lake") and to The Atchison, Topeka and Santa Fe Railway Company ("Santa Fe") of authority to construct and operate a rail line in the coal-rich San Juan Basin of northwestern New Mexico, a region whose coal resources cannot currently be tapped because there is no way to move the coal to markets. Nearly all of petitioners' objections are meritless. This Court has concluded, however, that two aspects of the proceedings before the ICC were deficient and that the case should therefore be remanded.

Star Lake filed an application for construction and operation authority, under what is now 49 U.S.C. § 10901 (Supp. IV 1980), on September 3, 1976. During the following several years, the Department of the Interior, with help from the ICC and from other agencies, prepared a comprehensive environmental impact statement, which exhaustively analyzed the physical, social, and economic effects of the proposal and which concluded that the Star Lake rail line was a method of transporting coal that would be highly beneficial to the region and that was environmentally superior to alternative methods. In 1979 Star Lake submitted supplemental information, and on March 6, 1980, the ICC decided to consider the application under its modified procedure, 49 C.F.R. §§ 1100.43–1100.52 (1981), solely on written submissions and without a hearing.

Petitioners, who represent various Navajo Indian interests in the area where the rail line would be built, intervened shortly thereafter. Petitioners objected to the Star Lake proposal on numerous grounds: that Star Lake was not financially fit, that it had obtained consents to rights of way from Navajos by improper means, that there was no need for the rail line, that the record contained insufficient information on Star Lake's affiliations with prospective customers, that the environmental impact statement was deficient under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C) (1976), and that granting the construction and operation authority would violate various federal statutes, including the American Indian Religious Freedom Act ("AIRFA"), 42 U.S.C. § 1996 (Supp. IV 1980), the Indian Laws, 25 U.S.C. §§ 312, 313 (1976), the National Historic

* Sitting by designation pursuant to Title 28 U.S.C. § 294(d).

Preservation Act ("NHPA"), 16 U.S.C. § 470f (1976), and the National Trails System Act, 16 U.S.C. §§ 1241–1249 (1976). In addition to raising those objections, petitioners sought leave to conduct a broad range of discovery on Star Lake and on Star Lake's proposed rail line.

On October 23, 1980, the ICC denied the discovery request because it considered the evidentiary record adequate to make the statutory determination whether the public convenience and necessity required or permitted the Star Lake rail line. On March 23, 1981, the ICC rejected petitioners' objections to the rail line, made findings favorable to Star Lake, and granted the certificate. Because Santa Fe would operate the line once Star Lake had constructed it, the ICC conditioned its approval on Santa Fe's joinder as an applicant, a condition that Santa Fe subsequently fulfilled. On July 8, 1981, the ICC reopened the record to reconsider alternative routes and possible measures to mitigate any adverse environmental effects of the rail line. The ICC prepared a supplemental environmental analysis, received comments from the several interested parties, including the State of New Mexico (which urged immediate construction of the line), and on February 3, 1982, reaffirmed its grant of construction and operation authority, adding certain mitigation requirements. This appeal followed.

Petitioners make here virtually all the arguments they raised before the ICC. We have reviewed these arguments and find almost all so lacking in merit as not to warrant discussion. Litigants should be reminded that they do not help their cause by filling their briefs with so many empty arguments that it becomes difficult to discover any valid claims amidst the clutter. In the welter of claims made by petitioners, we have found two that deserve attention.

## I.

Petitioners contend that the ICC's conclusion that the rail line will be self-sustaining must be reversed. We agree with one of the arguments put forth to support this contention: the ICC erred in failing to require that Star Lake or Santa Fe comply with ICC regulations requiring the submission of estimates of the expenses and receipts expected for the rail line's operation.

The ICC may award a railroad a certificate of authority to construct and operate a rail line only if it is "convinced that the proposed venture [will] not drain the railroad's resources and disable it from performing those duties of public service under which it then rested, with consequent detriment to the public in the matter of service and rates." *ICC v. Oregon-Washington R.R.,* 288 U.S. 14, 37, 53 S.Ct. 266, 272, 77 L.Ed. 588 (1933) (footnote omitted). That is, the ICC must determine that the applicant is financially "fit." The ICC here undertook to meet this obligation by inquiring whether Star Lake's proposal "in the reasonably near future will be self-sustaining, or so nearly so as not unduly to burden interstate commerce." *Id.; Illinois Cent. R.R. v. Norfolk & W. Ry.,* 385 U.S. 57, 66–67, 87 S.Ct. 255, 260–261, 17 L.Ed.2d 162 (1966).

In finding that the proposed rail line would be self-sustaining and hence that Star Lake and Santa Fe, the two companies granted certificates, were financially fit, the ICC failed to follow its own regulations. Those regulations require an applicant for construction or operation of rail lines to submit, among other things,

> [a]n estimate, in detail, of the character and volume of traffic expected and the gross revenue to be derived therefrom, covering each of the first five years of operation, together with an estimate of the annual gross revenues expected after the first five years. The detailed estimate required for the first five years should show the amount of each class of traffic, the mean length of haul, the rate per unit, and the revenue to be derived, also chief points or territories of origin and destination.

49 C.F.R. § 1120.6 (1981) (Question 29). The regulations further require an applicant to estimate the

gross revenue, operating expenses, net revenue, and net railway operating income, corresponding with the estimates of traffic under question 29. By "net railway operating income" is meant the excess of the credits over the debits to income, as reflected by the operating revenue, operating expense, railway tax accrual, uncollectible railway revenue, equipment rent, and joint facilities rent accounts.

*Id.* (Question 30).

It is clear from the record, and counsel for Star Lake and Santa Fe conceded at oral argument, that the ICC did not have before it the required information on Santa Fe's expected operating expenses and revenues, though it did have information on Star Lake's estimated construction expenses and revenues. Contrary to the suggestion of Star Lake's and Santa Fe's counsel, the regulations' requirements·are not met by the ICC's grant of exemptions under 49 U.S.C. § 10505 (Supp. IV 1980) from the requirement, 49 U.S.C. §§ 11301, 11343 (Supp. IV 1980), that the ICC approve the financing and operating agreements between the two companies, under which Star Lake was to construct the line with financing from Santa Fe, which would rent it from Star Lake and operate it. The grant of those limited exemptions did not, as counsel for Star Lake and Santa Fe contended at oral argument, remove consideration of operating viability from this proceeding.

In some circumstances, failure by the ICC to insist on strict compliance with its regulations affords no basis for invalidation of its approval of a rail line, *see American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970), but here the required information is easily provided and is critical to the ability of the ICC and of interested parties such as petitioners to evaluate whether the proposed venture will be self-sustaining. *Compare id.* Of course, the ICC retains considerable discretion in assessing the adequacy of the applicants' submissions. *See id.* Nevertheless, it may not completely ignore

its own regulations, as it has done here. In this respect the ICC acted arbitrarily and capriciously and not in accordance with law.

## II.

On the second issue worthy of attention, petitioners alleged before the ICC that, in attempting to obtain consent to construction of the line from the Indian allottees along the right-of-way, Star Lake was guilty of overreaching and of making false and misleading statements. The ICC took the position that these allegations are not within its jurisdiction and that it must defer to the finding of the Department of the Interior, the agency charged with primary responsibility for granting rights-of-way across Indian lands. 25 U.S.C. §§ 312, 323 (1976). Instead of awaiting and then acting upon Interior's findings on these issues, however, the ICC chose to defer to Interior by ignoring the allegations and by granting permission to construct the line subject to whatever corrective action the Department of the Interior might choose to take. Since the Department of the Interior thereafter found it unnecessary to pass on the allegations of misconduct, it now appears that no agency will consider the merits of the charges or their relevance to the issues before the ICC.

We cannot agree that the ICC may grant permission without itself considering the Navajo allegations. As shown below, some of the issues raised by the Navajo parties' allegations are relevant to the ICC's statutory duty to consider whether the construction of the line haul will be in compliance with the American Indian Religious Freedom Act, 42 U.S.C. § 1996 (Supp. IV 1980), and the National Historic Preservation Act, 16 U.S.C. § 470f (1976), and, more generally, whether the construction of the line is in the public interest. 49 U.S.C. § 10901(a) (Supp. IV 1980).

### A.

As part of its duties under NHPA and AIRFA, which require the preservation of and access to historic and religious sites, the ICC required Star Lake to guarantee that it

would, to the best of its ability, take steps to salvage information from and to mitigate damage to the archeological and religious sites that would be damaged or destroyed by the construction of the proposed line. Somewhat more specifically, the ICC noted in its notice of authorization that Star Lake would "take steps to substantially mitigate any adverse impacts of its proposal (including fencing the right-of-way, restricting contractors from excessive disturbances of the terrain, and requiring contractors to return disturbed areas to their pre-construction condition)."[1] Star Lake has reiterated its commitment on this appeal.

In addition to their interests in historic and sacred sites, the Navajo parties also have protected property interests along the right-of-way. It is these interests that are the focus of the allegations of misconduct and of the proceedings before the Department of the Interior. The proposed line crosses large portions of Navajo tribal trust land and individually owned Indian allotment land. The construction would require the relocation of about 250 Navajos. In order to build across Indian lands, Star Lake sought to obtain the consent of the Secretary of the Interior under 25 U.S.C. § 312. Interior has taken the position that, under the Act of March 2, 1899, codified at 25 U.S.C. §§ 312–318 (1976), and the Act of February 5, 1948, codified at 25 U.S.C. §§ 323–328 (1976), and regulation 25 C.F.R. § 169.3 (1982), Star Lake must obtain the consent of the Indian owners along the right-of-way.

The Navajo parties charged that, in its attempt to obtain these consents, Star Lake was guilty of serious misconduct: that it employed coercive tactics, made misleading statements concerning the value of the land and the legal effect of the forms it sought to have signed, and otherwise took advantage of legally and commercially unsophisticated owners, many of whom speak or read little English.[2] A field solicitor for Interior described Star Lake's behavior as unconscionable in at least one instance,[3] and the ICC acknowledged that the charges of misconduct were serious. However, the Commission declined to consider the allegations on the ground that the issue was being "fully and fairly addressed" by the Department of the Interior.[4] For the same reason, the Commission refused to consider the Navajo parties' claims that the proposed right-of-way would violate 25 U.S.C. §§ 312, 313 (1976), which set limits on the conditions under which the Secretary of the Interior may grant a right-of-way.

In subsequent proceedings before the Department of the Interior, the Navajo owners withdrew the consents in question. The Department found the withdrawals valid, and because the owners no longer consented, the Department refused Star Lake permission to build across Navajo land.[5] It was thus unnecessary for Interior to pass upon the claims that, in obtaining the now withdrawn consents, Star Lake had acted unconscionably.

## B.

The ICC is charged with determining whether "the present or future public

---

1. Star Lake Railroad Co.—Rail Construction and Operation in McKinley County, New Mexico, ICC Finance Docket No. 28272, at 7, 12 (March 23, 1981).

When the Environmental Impact Statement was completed, Star Lake had not yet determined the steps it would take to preserve various sites. *See* 2 Environmental Statement, Ch. IV at 6.

2. The Navajo parties submitted twenty-three affidavits of individual owners alleging that agents of Star Lake misrepresented themselves as agents for the Bureau of Indian Affairs, misrepresented forms consenting to construction as merely forms consenting to a survey, failed to specify a price or later to negotiate a

price for land, and told individual owners that they would go to jail if they did not consent to the construction of a railroad across their lands.

3. Opinion of the Office of the Field Solicitor, Window Rock, Arizona, at 3 (Sept. 21, 1979).

4. *Star Lake Railroad Co., supra* note 1, at 15.

5. Navajo New Mexico Ranchers Association v. Commissioner of Indian Affairs, No. IBIA 80–47–A (ALJ, Dep't of the Interior, June 29, 1981), *aff'd,* No. IBIA 80–47–A (Assistant Secretary of Indian Affairs, Dep't of the Interior, Mar. 21, 1982).

convenience or necessity" requires the construction of an additional railroad line. 49 U.S.C. § 10901(a) (Supp. IV 1980). In carrying out this task, the Commission must consider whether the construction "would subject the communities directly affected to serious injury...." *Colorado v. United States,* 271 U.S. 153, 169, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926). The American Indian Religious Freedom Act, 42 U.S.C. § 1996 (Supp. IV 1980), the National Historic Preservation Act, 16 U.S.C. § 470f (1976), and the Acts of March 2, 1899, and of February 5, 1948, 25 U.S.C. §§ 312–318, 323–328 (1976), help define the types of injuries from which the ICC must strive to protect local communities. By ignoring the serious charges of misconduct and violations of statutes designed to protect Indian lands, the ICC failed to consider (A) the evidence of bad faith in Star Lake's promises to preserve sacred and historic Indian sites and (B) the public policy of avoiding unnecessary disturbance of the Indians' quiet possession. Thus, we believe that the ICC failed to "draw its conclusion from the infinite variety of circumstances which may occur in specific instances." *ICC v. Parker,* 326 U.S. 60, 65, 65 S.Ct. 1490, 1493, 89 L.Ed. 2051 (1945).

### 1. *The Charges of Bad Faith*

The failure to consider the allegations of misconduct undermines the Commission's finding of compliance with the American Indian Religious Freedom Act, 42 U.S.C. § 1996, and the National Historic Preservation Act, 16 U.S.C. § 470f. AIRFA adopts a federal policy of protecting and preserving "for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian ..., including but not limited to access to sites...." 42 U.S.C. § 1996. NHPA directs agency heads, in spending money or granting licenses, to take into account the effect on certain historic sites. 16 U.S.C. § 470f. The Commission attempted to enforce the two Acts in part by requiring Star Lake to make rea-

sonable efforts to mitigate adverse effects on sites along the proposed right-of-way. As the Environmental Impact Statement noted, the area through which the proposed line would pass is unusually rich in archeologically important sites and in sites of religious significance to the Navajos.[6]

This court held in *Mobil Oil Corp. v. ICC,* 685 F.2d 624 (D.C.Cir.1982), that the ICC's requirement that a railroad take "reasonably practical" or "reasonably required" "mitigation measures" to protect, among other things, paleontological and archeological resources, placed on the railroad an "obligation of good faith." *Id.* at 639. We affirmed the ICC's decision in that case, noting that the worries about the railroads' good faith were purely speculative. *Id.* Here, however, we are not faced with mere speculation. The ICC was offered evidence of Star Lake's bad faith in dealing with the Indian parties in the closely related matters of acquiring their consents. The Commission's ready acceptance of the railroad's assurances that it would take appropriate steps to mitigate the damage to historic and sacred sites, together with the Commission's ready dismissal, on "jurisdictional" grounds, of allegations that Star Lake's dealings with individual Indians were characterized by coerciveness and unconscionability, does not adequately take account of the federal policies adopted in AIRFA and NHPA.

We agree with the ICC that it may defer to any findings of the Department of the Interior concerning the claims of misconduct. There would, of course, be no need for the ICC to duplicate any Interior Department investigation and report, especially since Interior has the primary responsibility and presumably the greater expertise in this area. However, we do not believe that the ICC properly defers in this case by itself granting permission before action on the allegations has been taken by the Interior Department. Rather, where, as here, a factual question within the primary responsibility of a sister agency is relevant to the ICC's determinations, the ICC should ordinarily defer by staying its

---

**6.** *See* 1 Environmental Statement, Ch. II at 89,      Ch. IX at 7 (Feb. 2, 1979).

decision pending a determination of the issues by the sister agency and then considering and acting upon that agency's findings. If, for instance, the Department of the Interior were to find that Star Lake has been guilty of bad faith in its dealings with the Navajo owners, then the ICC would have to consider the relevance of that finding to the good faith of the railroad in offering to protect historic and sacred Indian sites. However, since the Interior Department has failed to resolve the question whether Star Lake dealt unconscionably with the Navajo owners, and since the issue is relevant to the AIRFA and the NHPA issues before the ICC, the Commission will be required to accept evidence on the question and to make its own determination.

### 2. *The Right to Quiet Possession*

Finally, and more generally, the Act of March 2, 1899, 25 U.S.C. §§ 312–318, and the Act of February 5, 1948, 25 U.S.C. §§ 323–328, reflect a federal policy of avoiding or minimizing the disturbance of the Indians' quiet possession of the restricted domains they now occupy. Although we agree with the Commission that it need not pass on the precise conditions on grants of right-of-way that have already been the subject of proceedings before the Interior Department,[7] we nevertheless hold that this policy of non-disturbance may not be ignored by an agency charged with determining whether the building of a new line is in the public interest. The ICC is bound to consider the extent to which the proposed construction is consistent with the public

interest in preserving the status of the Navajo tribe as a "quasi-sovereign nation" and in preserving the tribe's ability "to maintain itself as a culturally and politically distinct entity." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 71, 72, 98 S.Ct. 1670, 1683, 1684, 56 L.Ed.2d 106 (1978).

---

**7.** Interior's disposition of the Navajo parties' claim that the proposed line violated 25 U.S.C. § 313 (1976) is unclear. Section 313 sets a maximum width of fifty feet on each side of the center line, with certain exceptions. The parties do not appear to dispute that the proposed line violates this law. However, the Interior's administrative law judge found that the Act of February 5, 1948, 25 U.S.C. §§ 323–328, "allows a right-of-way as wide as reasonably necessary." *Navajo New Mexico Ranchers Association v. Commission of Indian Affairs, supra* note 5, at 8. This "finding" clashes with express Interior regulations. Section 169.23(b) of 25 C.F.R. expressly applies the width requirements of 25 U.S.C. § 313 to rights-of-way

granted under the 1948 Act, 25 U.S.C. §§ 323–328. On appeal, the Assistant Secretary of Indian Affairs did not discuss this issue. The Secretary simply held that Star Lake had not obtained proper consent and was therefore barred from commencing construction. At this point, the railroad commenced a state action to condemn the land in question. We express no opinion as to the relevance of 25 U.S.C. § 313 and 25 C.F.R. § 169.23(b) to that proceeding.

Lack of clarity in Interior's conclusions about compliance with 25 U.S.C. § 313 does not in and of itself oblige the ICC to address the specific statutory question. We hold only that the ICC must address itself to the federal policies embodied in that and other statutes.