850 F.2d 729
 271 U.S.App.D.C. 36
 NEW MEXICO NAVAJO RANCHERS ASSOCIATION, et al., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Star Lake Railroad Company, et al., Intervenors.
NAVAJO TRIBE OF INDIANS, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Star Lake Railroad Company, et al., Intervenors.
 Nos. 85-1071, 85-1072.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 25, 1988.
Decided June 21, 1988.
 
 Paul E. Frye, Albuquerque, N.M., for petitioners New Mexico Navajo Ranchers Ass'n, et al.
 Judith Bartnoff, with whom Jean V. MacHarg, John L. Oberdorfer, Washington, D.C., and Donna C. Bradley, Window Rock, Ariz., were on the brief, for petitioner Navajo Tribe of Indians.
 Cecelia E. Higgins, Atty., I.C.C., with whom Robert S. Burk, General Counsel, I.C.C., Henri F. Rush, Deputy General Counsel, I.C.C., John J. Powers, III and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 R. Eden Martin, Lawrence A. Miller, Ronald S. Flagg, Washington, D.C., Milton E. Nelson, Jr. and Richard E. Weicher, Chicago, Ill., were on the brief for intervenors Star Lake R. Co., et al.
 Before EDWARDS, SILBERMAN and WILLIAMS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 Concurring opinion filed by Circuit Judge EDWARDS.
 WILLIAMS, Circuit Judge:
 
 
 1
 For over a decade, members of the Navajo Tribe have attempted to block the construction of a railroad in the coal-rich San Juan Basin of northwestern New Mexico. The fight stems from concern that the railroad--and the coal extraction that it would make possible--would adversely affect the religious practices, cultural values and economy of the Navajo Indians living in the area. In 1982, after prolonged skirmishing, the Navajos lost a key round when the Interstate Commerce Commission granted two railroad companies--the Star Lake and the Atchison, Topeka and Santa Fe--authority to construct and operate the railroad. This court reviewed that grant of authority in New Mexico Navajo Ranchers Ass'n v. ICC, 702 F.2d 227 (D.C.Cir.1983) (Navajo I ), and remanded to the ICC for further consideration. Concluding that the Commission adequately responded to the original concerns, we affirm its renewed decision to authorize construction of the Star Lake line.
 
 I. BACKGROUND
 
 2
 In 1976 Star Lake and Santa Fe filed an application with the ICC pursuant to 49 U.S.C. Sec. 10901 (1982), seeking authority to construct and operate an 82-mile rail line near the Navajo reservation in the San Juan Basin. The former proposed to construct the line, the latter to operate it. The Commission granted the requested authority in 1981, then reopened it to consider supplemental evidence, and in 1982 affirmed the original outcome.
 
 
 3
 The New Mexico Navajo Ranchers Association, certain individuals, and local Navajo communities petitioned for review of the ICC decision. In Navajo I, we reversed the grant of authority. We held that in carrying out its task of determining whether "the present or future public convenience and necessity" requires or permits the construction of an additional rail line, 49 U.S.C. Sec. 10901(a), the ICC "must consider whether the construction 'would subject the communities directly affected to serious injury....' " 702 F.2d at 232 (quoting Colorado v. United States, 271 U.S. 153, 169, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926)). We specifically required the ICC to consider, in its analysis of the public convenience and necessity, whether construction of the Star Lake line would comply with the federal policies seeking to (1) protect sacred and historic Indian sites and (2) avoid unnecessary disturbance of the Indians' quiet possession of their land and of the Navajo Tribe's status as a "quasi-sovereign" nation. We also found that the Commission acted arbitrarily when it failed to require Santa Fe to submit evidence of its expected operating revenues and expenses.
 
 
 4
 On remand, the ICC permitted intervention by the Navajo Tribe. On December 7, 1984, the ICC affirmed its earlier grant of authority, subject to certain conditions designed to minimize damage to sites of religious significance to the Indians. The same month the Association petitioned the ICC to reopen its decision to consider new financial evidence. In December 1985 the Commission granted the request and on April 20, 1987 reaffirmed its grant of construction and operation authority to the railroads.
 
 
 5
 We note here a technical difficulty in our jurisdiction. While the Association's petition to reopen was pending, it filed this petition for review. This court placed the action in abeyance pending the agency's decision on reopening. Our decision to place it in abeyance seems necessarily to have rested on an assumption that this court secured jurisdiction despite the premature filing, an assumption of questionable validity. See Western Union Telegraph Co. v. FCC, 773 F.2d 375, 377 (D.C.Cir.1985) (dismissing appeal filed prematurely); Public Citizen v. NRC, 845 F.2d 1105 (D.C.Cir.1988) (same). As the legal premise of the abeyance order is the law of the case, and that order is surely the basis for petitioners' not refiling when the Commission action ultimately became final, we treat the Commission's final decision as reviving the original petition.
 
 
 6
 We now review to determine whether the ICC's final decision on remand satisfactorily conformed to our directions in Navajo I.
 
 II. STAR LAKE'S ALLEGED MISCONDUCT
 
 7
 The first issue we address concerns Star Lake's conduct in getting consents from Indian allottees owning land along the proposed route. The allottees are just one of the many groups of land owners in the area, whose diverse character has "earned it the sobriquet 'the checkerboard.' " I Joint Appendix ("J.A.") at 30. They own the land in question in severalty--i.e., independent of the Tribe--but without the full power of alienation. The authority to grant a right-of-way over the land is vested in the Department of the Interior, which had made the allottees' consents a condition of such a grant. Petitioners charge that in soliciting these consents Star Lake used coercive tactics, made misleading statements concerning the value of the land and the legal effect of the forms it sought to have signed, and otherwise took advantage of legally and commercially unsophisticated owners, many of whom speak or read little English.
 
 
 8
 So far as any use of the consents by the railroads is concerned, the propriety of Star Lake's means of securing them is altogether moot. After 32 allottees withdrew their consents, complaining that they misunderstood the consent forms, the Department of the Interior declined to grant Star Lake the requested right-of-way over Indian allotment land. Star Lake and Santa Fe then filed suit to condemn the right-of-way. After our remand in Navajo I, the parties voluntarily dismissed the condemnation suit. Star Lake and Santa Fe remind us, however, that the suit could be renewed after our decision in this appeal.
 
 
 9
 In Navajo I we recognized that the validity of the consents had become academic, but found continuing significance in Star Lake's conduct in acquiring them. We held this conduct relevant to the ICC's duty under the American Indian Religious Freedom Act, 42 U.S.C. Sec. 1996 (1982), and the National Historic Preservation Act, 16 U.S.C. Sec. 470f (1982), to consider the effect of the line on religious and historic Indian sites that the rail line may jeopardize. The first of those statutes declares it federal policy to protect and preserve the right of American Indians to exercise their traditional religions, including their access to sites. The second requires federal agencies, before issuing a license for any undertaking, to consider its effect on sites included in or eligible for inclusion in the National Register of Historic Places. In Navajo I we found that since the area through which the line would pass was "unusually rich in archeologically [sic] important sites and in sites of religious significance to the Navajos," 702 F.2d at 232, the ICC's mandate under 49 U.S.C. Sec. 10901(a) to determine whether construction of the line was in the public interest required it to consider these impacts. More specifically, we took the view that Star Lake's past record was relevant to the propriety of the ICC's accepting its assurances that it would take suitable steps during construction to prevent or mitigate losses.
 
 
 10
 The ICC originally took the position that the allegations of Star Lake's bad faith during the right-of-way acquisition process were not within its jurisdiction, but rather that of the Department of the Interior. Instead of waiting for Interior's findings on this issue, however, it had simply ignored the allegations, granting the railroad permission to construct the line and leaving to Interior the issue of possible action as to the alleged misconduct. We disapproved this course of action in Navajo I. Although we noted that normally it would be proper for the Commission to wait until its "sister agency" primarily charged with the problem had resolved the issue of Star Lake's good faith, here, since Interior never reached the issue of Star Lake's behavior, we said the Commission should have made its own evaluation. 702 F.2d at 232-33.
 
 
 11
 We note parenthetically that in a decision released after oral argument in this case the Supreme Court held that "[n]owhere in [AIRFA] is there so much as a hint of any intent to create a cause of action or any judicially enforceable individual rights." Lyng v. Northwest Indian Cemetery Protective Ass'n, --- U.S. ----, 108 S.Ct. 1319, 1328, 99 L.Ed.2d 534 (1988). But in Lyng the contention was that AIRFA alone provided a private right of action to enjoin the government's construction of a road that impacted on Indian religious practices. Here we are concerned with the ICC's statutory duty to weigh the public interest, a task that in Navajo I we held required it to consider the policies embodied in AIRFA. The extent to which our holding survives Lyng is debatable. But we leave this question to another day, in view of Navajo I 's explicit instruction to the ICC to consider AIRFA's policies and our finding today that the ICC satisfactorily complied with this mandate.
 
 
 12
 On remand, the ICC concluded that under the circumstances it could rely on the railroad's promises to mitigate any damage to the environment and to religious and cultural sites that might result from construction. Petitioners say that Star Lake's right-of-way conduct proves it unworthy of trust and insist that the agency should have been more skeptical of these promises. We disagree. True, the ICC found that in attempting to obtain the rights-of-way, the railroad solicitors occasionally had been "overzealous," I J.A. at 39, and at times had acted improperly. For example, the Commission found that one railroad employee, Benjamin Chee, may have told certain allottees that the consent was only for a survey. Id. at 36-37. Another, J.B. Collyer, sometimes signed consent forms as a witness when in fact he was not present at the time the allottee signed. Id. at 40. But the ICC found that overall Star Lake had made good faith efforts to inform the Navajo allottees of the nature of the consents, id. at 37, and that there was no consistent use of pressure by Star Lake on the allottees, id. at 39. It found that "the railroads generally did not act in bad faith in obtaining the consents," id. at 42 (emphasis added), and we think this finding adequately supported.
 
 
 13
 Our willingness to defer to the ICC is bolstered by its decision to impose specific mitigation measures on the railroads to protect access to religious and historic sites. Whereas in its original decision the Commission required only that Star Lake take "necessary steps" to protect the environment, this time it ordered the railroad to hire an archaeologist to be present during construction in order to identify and evaluate any previously undocumented religious or historic sites that might be disturbed by construction. The Commission required that the archaeologist demonstrate his or her neutrality by an affidavit asserting the absence of any existing or prior business relationship with the railroads, the Navajo Tribe, or any Navajo chapter. Id. at 47. Star Lake and the archaeologist are to consult religious leaders designated by the Navajo Tribe to identify and preserve access to sacred sites that may be recognizable only to Navajo religious practitioners. The Commission made clear that it expected to be "informed promptly of any contentions that the railroad is not proceeding in substantial compliance with [its] promises" to mitigate and that it would "take timely remedial action if any such contentions warrant." Id. at 42.
 
 
 14
 Especially in light of these extra requirements, we think the ICC could properly find that the instances of misconduct on the part of a few Star Lake employees over a decade ago should not now block construction of the railroad.
 
 
 15
 Petitioners make one final argument under AIRFA. Our decision in Wilson v. Block, 708 F.2d 735 (D.C.Cir.), cert. denied, 464 U.S. 956, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983), they maintain, required the Commission to consult Indian religious leaders about the railroad's likely effect on religious sites. In discussing agencies' duties to learn about and avoid unnecessary interference with traditional Indian religious practices, the Wilson court stated that they "ordinarily should consult Indian leaders before approving a project likely to affect religious practices." 708 F.2d at 746.
 
 
 16
 Here the Commission did not deal directly with Navajo religious leaders. It relied on past consultation between the Star Lake and secular Navajo leaders; on a requirement of future consultation between the railroad and tribal religious leaders; and on the use of an archaeologist during construction to identify religious sites. As noted above, if any sites are identified, the archaeologist is to recommend appropriate accommodation, and, if the railroad fails to comply, the Commission will take appropriate responsive measures. I J.A. at 46-48.
 
 
 17
 Assuming Wilson to be unaffected by Lyng v. Northwest Indian Cemetery Protective Ass'n, supra, we find no violation of its precepts. First, of course, the "ordinarily" in the quoted sentence is not synonymous with "always." Moreover, the holding of Wilson--that the Forest Service's consultation with religious leaders was sufficient to fulfill the agency's duty to inform itself--is far from a holding that such consultation is necessary. Indeed, the passage simply does not address the question of indirect consultation through other parties. We note that in Standing Deer v. Carlson, 831 F.2d 1525, 1530 (9th Cir.1987), the court read Wilson as requiring federal officials simply to "seek to understand and avoid interfering with Native American religious beliefs and practices."
 
 
 18
 Further, what may be suitable implementation of AIRFA in one context need not be in another. The religious site at issue in Wilson was the San Francisco Peaks, a site considered sacred in its entirety by all Navajos and Hopis. Here no Navajo party has argued that there is any affected site of religious significance to the Tribe as a whole; the entire San Juan Basin contains areas that may be significant to individual Navajos at specific locations. It is not clear that any process short of construction will bring to light the significant ones--if such there be. In fact, the Indians have never identified any specific religious sites along the proposed route that have not been accommodated. At oral argument petitioners defended this lack of evidence on the ground that the Navajos' religion permits certain sites to be talked about only in winter. But the reason why the evidentiary cupboard is bare does not change the fact that it is.
 
 
 19
 Commission counsel at oral argument confirmed the Commission's determination to exercise its authority to ensure that the railroad adopts reasonable measures to accommodate the Navajos' interest in such sites as may be discovered. With this understanding we reject the claim that the ICC disregarded AIRFA.
 
 
 20
 III. QUIET POSSESSION AND QUASI-SOVEREIGN STATUS
 
 
 21
 As we recognized in Navajo I, the Act of March 2, 1899, 25 U.S.C. Secs. 312-18, and the Act of February 5, 1948, 25 U.S.C. Secs. 323-28 (referred to by the parties collectively as the "Indian Acts"), both reflect a federal policy of avoiding or minimizing the disturbance of the Indians' quiet possession of their remaining territory. 702 F.2d at 233. Holding that this policy "may not be ignored by any agency charged with determining whether the building of a new line is in the public interest," id., we directed the ICC to give it consideration on remand. We also directed the ICC "to consider the extent to which the proposed construction is consistent with the public interest in preserving the status of the Navajo Tribe as a 'quasi-sovereign nation' and in preserving the tribe's ability 'to maintain itself as a culturally and politically distinct entity.' " Id. (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 71-72, 98 S.Ct. 1670, 1684, 56 L.Ed.2d 106 (1978) (construing Title I of the Indian Civil Rights Act of 1968, 25 U.S.C. Secs. 1301-03, as not affecting tribal immunity to certain suits)).
 
 
 22
 As an initial matter, we find petitioners' argument that construction of the Star Lake line would violate 25 U.S.C. Secs. 312 and 313 without merit. In Navajo I, we expressly recognized that the Commission was not obligated "to address the specific statutory question" of compliance with these statutes, which provide certain means--not now being employed by the railroads--for acquisition of rights-of-way through Indian territory. We held only that the Commission's mandate to consider the public interest required it to take into account their underlying policies. 702 F.2d at 233 & n. 7.
 
 
 23
 The Commission plainly followed this mandate. In assessing the line's interference with the Navajos' quiet possession of their present lands, the ICC first pointed out that the Indian Acts specifically provided for grants of rights-of-way over allotment lands and preserved the remedy of condemnation. Consequently, the Commission reasoned, "the policy is by no means absolute." I J.A. at 48. It then considered the fact that construction of the line would necessarily diminish the holdings of some members of the Tribe, obstruct access to the land and impair its suitability for grazing. Id. It balanced this impact against the importance of the Star Lake project to the public, the allottees' compensation for their land, and the Indians' derivation of other benefits from the railroad, including increased employment and higher income. Id. We think it was within the Commission's discretion to conclude that these considerations "outweigh the relatively minor loss of land that the Indians will incur." Id.
 
 
 24
 Under Navajo I 's instructions to consider the public interest in "preserving" the Tribe's "quasi-sovereign status" and political and cultural identity, the Commission undertook a broader inquiry into the alleged detrimental effects of the line on the Navajos' social structure, economy, environment, cultural values, and mental health, as well as the Tribe's ability to provide such services as education, law enforcement and health care. Id. at 49-52. We find no abuse of discretion in the Commission's conclusion that the line would not impermissibly undermine the Tribe.
 
 
 25
 The Commission relied considerably on its belief that the social and cultural effects of the Star Lake line would be quite similar in character to those of a railroad that the Tribe itself proposed to build--the "Navajo Railroad." Id. at 51. This line is slated to run right through the Navajo reservation. If built, it would make it possible to exploit tribal coal reserves; the Star Lake line would serve mines owned by others. The agency found, for example, that (contrary to the Tribe's assertion) the relocation of some Navajo residents residing near the Star Lake line will not unduly diminish the Navajos' enjoyment of their lands because the Navajo Railroad would cause relocation of more Navajos than the Star Lake line. See id. at 51 n. 10 (pointing out that the number of households along the former line is twice that of the latter).[1]
 
 
 26
 The Commission's argument here is plainly of the "So's your old man" variety. But to so label it is not to discount it. Presumably recurrent rhetorical gambits often have legitimate force. Here, the Tribe's willingness to suffer its own line's similar impacts surely reflects a judgment that those impacts are not likely to seriously impair the fabric of tribal life. Especially in light of the difficulties in predicting social effects, the certainty that social change will accompany any economic development, and the lack of consensus on how to appraise entirely foreseeable social changes (would a 20% increase in divorce be a sign of social decay or of increased freedom? if both, is it good or bad? if bad on a net basis, how much economic development is needed to outweigh it?), we think the Commission could properly rely on the Tribe's own view of a comparable project.
 
 
 27
 Petitioners claim that the Star Lake line threatens not only the social and cultural but also the economic well-being of their tribal organization. Treating the Commission's proceeding as if it were a sort of comparative hearing between two railroad sponsors, they assert two negative effects. First, they contend that the Navajo Railroad would result in more employment of Navajos than its Star Lake counterpart. As a factual matter this is in dispute. The Commission acknowledged that the mine to be served by the Navajo Railroad was committed to giving Navajos a preference in hiring, whereas the off-reservation mines to be served by the Star Lake line were not. Id. at 51-52. We find nothing in the record indicating what proportion of workers are likely to be Navajos in the absence of such a commitment. On the other hand, the Commission noted that the testimony of the Tribe's own witness indicated that construction of the Star Lake line would provide more employment of Navajos than construction of the Navajo Railroad and that operation of the former line could pay more wages to Navajos than the latter line. Id. at 51. Thus the data are inconclusive.
 
 
 28
 Second, the Tribe fears that the Star Lake line would foreclose the building of the Navajo Railroad and its development of its own coal. On the Tribe's theory, the Star Lake line could cost it substantial sums in royalties and tax payments that would otherwise flow from the operation of its mines. (The Association's brief uses the figure $200 million as an estimate of tribal revenues annually foregone, Petitioners' Brief at 22, and the Commission's decision itself referred to such an estimate, I J.A. at 49. The only reference to $200 million that we can find in the record is in an economist's statement appearing to refer to possible tribal royalties totalled over an extended period (perhaps through 1995). See II J.A. at 181, 185.)
 
 
 29
 The Navajos' argument here implicitly assumes that the ICC should have treated the issue as a sort of comparative hearing between two applicants for mutually exclusive lines. It clearly could not do so, however; no application for certification of the Navajo Railroad has ever been filed. Further, the assumption of mutual exclusivity appears to be without foundation. As it is undisputed that the lines are not physically exclusive, the argument seems to be based entirely on the premise that demand for steam coal (which the San Juan Basin can produce) is a purely local matter, to be ascertained by counting up local power plants and their projected coal consumption. In fact Santa Fe looked into significant part to the export trade to sustain the railroad. See Grygiel Verified Statement, II J.A. at 1, 4. The Commission rejected petitioners' attacks on Santa Fe's analysis, I J.A. at 55-56, although it did not rely on the export estimates for its finding that the Star Lake line would be profitable, id. at 56. In fact the United States appears to export well over 10% of its coal production. See Statistical Abstract of the United States 1988, Table 905 (exports of 2.4 quadrillion Btu against production of 19.3). In a global coal market, the assumption that Star Lake coal would preclude development of the Navajos' own coal, over the 30-year expected lifetime of the railroad, is much too far-fetched to justify rejection of the only application pending before the Commission.
 
 
 30
 In any event, we believe the Commission was quite reasonable in holding that denial of authority to construct one line in order "to insulate Indian enterprises from competition" would "do violence to fundamental objectives embodied in the statutes [that the Commission] administer[s]." I J.A. at 50. In passing the Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1895, Congress sought to foster a freer, more competitive market in the rail business. See H.Rep. No. 96-1430, 96th Cong., 2d Sess. 115 (1980) (conference report on Staggers Act) (goal is to "permit easier entry, consistent with the policy of this Act to encourage greater reliance on marketplace forces than on government regulation"). Petitioners on this issue have effectively invited the Commission to embark on a very ambitious program of central economic planning, going far beyond consideration of market conditions in the railroad industry and looking instead to markets for the goods shipped. Because of the special concern for Indian welfare reflected in various statutes and found by Navajo I to inform the ICC's public interest analysis, we do not say that a proposed rail line's negative impact on the market for Indian goods is irrelevant. But proof of any such impact here is far too inconclusive to justify the drastically anti-competitive decision petitioners seek. The Commission did not err in rejecting their claim.
 
 
 31
 In weighing the public interest the Commission properly noted some of the benefits the Star Lake line could be expected to provide. It found that providing access to new coal supplies tended to protect the nation from excessive reliance on oil. I J.A. at 23; see also id. at 56 (predicting bright economic prospects for the line as nation's oil supplies dwindled). It also determined that the line will help the Navajos residing near it, particularly by providing substantial employment and income. Id. at 51. The Commission concluded that the line will result in "immense benefit to the Indians of the San Juan Basin and to the general public" that will "outweigh the relatively minor adverse impacts of the proposal." Id. at 34. If the "immense" and "minor" sound too much of Pollyanna, they were unnecessary; we cannot find an abuse of discretion in the basic finding that on a net basis the railroad would advance the public convenience and necessity.
 
 
 32
 We recognize that in finding the line to be a net benefit to the Indians the Commission's appraisal is at odds with the Tribe's. But the Commission was legally bound to make its own judgment, and in view of the opposition's heavy reliance on the unsupported foreclosure theory, we cannot say the judgment was defective. Further, of course, the Commission was bound to consider impacts on non-Indian Americans as well.
 
 
 33
 In fact, petitioners appear to suggest that the controlling test must be the net effect on Indians exclusively. They cite, for example, language in California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 1092, 94 L.Ed.2d 244 (1987), speaking of the federal government's "overriding goal of encouraging tribal self-sufficiency and economic development." (Emphasis added, internal quotations omitted.) See also id., 107 S.Ct. at 1093 ("Self-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members"); New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 335, 103 S.Ct. 2378, 2387, 76 L.Ed.2d 611 (1983) (similar); Kerr-McGee Corp. v. Navajo Tribe, 471 U.S. 195, 201, 105 S.Ct. 1900, 1904, 85 L.Ed.2d 200 (1985) (Indians' power to tax is "an essential attribute" of Indian self-government since it enables Navajos to gain independence from federal government by financing tribal programs with tribal revenues); Seminole Nation v. United States, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942) (federal agencies' trust obligations to Indian tribes must be exercised according to the "most exacting fiduciary standards").
 
 
 34
 But while these cases recognized the federal interest in encouraging Indian self-sufficiency, none elevated it to the status of a universal trump. Cabazon and Mescalero dealt with the distinct issue of conflict between Indian and state sovereignty; Kerr-McGee with the power of the Secretary of the Interior to veto certain Navajo taxes; Seminole Nation with federal officials charged with delivering funds to a tribe, who instead turned them over to a tribal council known to be mulcting the tribe. Here we deal with an agency charged with advancing the "public convenience and necessity," which in Navajo I we held to include a special concern for various aspects of Indian welfare. But that concern is not exclusive, and we so acknowledged in Navajo I when we held that the Navajos' interests "may not be ignored by an agency charged with determining whether the building of a new line is in the public interest." 702 F.2d at 233 (emphasis added). We find that on remand the Commission did not ignore these interests, but carefully weighed them in the public-interest calculus.IV. FINANCIAL FIGURES
 
 
 35
 Our remand in Navajo I was based on one final ground: the failure of the railroads to submit estimates of the operating revenues and expenses expected for the line, as required by ICC regulation. 702 F.2d at 229. We deemed the missing estimates to be critical to the ICC's performance of its duty to assess whether the line would be self-sustaining in the reasonably near future. On remand, the railroads submitted these estimates, and after examining them (particularly the projections of traffic volume), the ICC reaffirmed its finding that the line would be self-sustaining. See I J.A. at 17-24.
 
 
 36
 Petitioners object that even on remand the financial submissions were not detailed enough. But while petitioners' opening brief identified various types of information said to be required by ICC regulations but not supplied, the ICC responded with citations to the figures, and petitioners' reply brief did not pursue the point. We recognized in Navajo I that the ICC retains considerable discretion in assessing the adequacy of applicants' financial submissions, 702 F.2d at 230, and petitioners suggest no inadequacy so grave as to require us to interfere with that discretion. Nor do petitioners identify any fatal defect in the reasoning behind the ICC's acceptance of the projections. The determination was one that the agency was uniquely qualified to make; we are bound to affirm unless it lacks a reasonable basis, which is not the case. See Southern Pacific Trans. Co. v. ICC, 736 F.2d 708, 718, 720-21 (D.C.Cir.1984), cert. denied, 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 322 (1985); Missouri-Kansas-Texas R.R. v. United States, 632 F.2d 392 (5th Cir.1980), cert. denied, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981).
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 For the reasons set forth above, the petitions for review are denied.
 
 HARRY T. EDWARDS, Circuit Judge, concurring:
 
 40
 I concur in the judgment but write separately to emphasize that I do not find the resolution of this case to be free from doubt.
 
 
 41
 First, because Navajo religious practices cannot be comprehended in conventional religious terms, because Navajo religious sites are not easily identifiable, and because of Star Lake's obvious interest in having its proposed line constructed as quickly as possible, I am troubled by the Commission's decision not to engage in direct consultations with Navajo religious leaders before approving the construction of the Star Lake line. One might have expected the Commission to be more solicitous of the petitioners' claim that the handling of consultations with Navajo religious leaders should not be delegated to Star Lake and other outside consultants.
 
 
 42
 Second, the majority places too much weight on the Tribe's alleged willingness to suffer societal and cultural detriments by building its own rail line. Surely, the Commission was required to make an independent evaluation of the adverse effects of the Star Lake line. To the extent that these adverse effects would be similar to those caused by the Navajos' line, this is the price the Navajos would be willing to pay voluntarily to achieve Congress' goal of tribal self-sufficiency. The majority's analysis thus brings to mind another "rhetorical gambit": Don't mix apples and oranges. Furthermore, the majority's apparent test in this regard--that the Commission should approve any proposed rail line through Indian lands unless the line will "seriously impair the fabric of tribal life"--is devoid of statutory support. In addition, the majority's statement fails to adhere to the test enunciated in Navajo I : "The ICC is bound to consider the extent to which the proposed construction is consistent with the public interest in preserving the status of the Navajo tribe as a 'quasi-sovereign nation' and in preserving the tribe's ability 'to maintain itself as a culturally and politically distinct entity.' " 702 F.2d at 233 (quoting Santa Clara Pueblo v. Martinez, 436 U.S. 49, 71, 72, 98 S.Ct. 1670, 1683, 1684, 56 L.Ed.2d 106 (1978)).
 
 
 43
 Third, the majority pushes the judicial deference envelope to the outer limit when it summarily approves the Commission's acceptance of Star Lake's financial projections. These projections are very sketchy to say the least; the Commission should have required Star Lake to make more than a half-hearted effort in formulating financial estimates. The deficiency in the record on this point, however, is not enough to overturn the Commission's judgment.
 
 
 44
 Finally, in my view, the majority opinion goes far afield when it "parenthetically" reaches out to suggest that Navajo I may not survive Lyng v. Northwest Indian Cemetery Protective Association. As the majority correctly notes, Lyng presented an issue that is not before us; therefore, we have no business speculating on questions that may appear "another day."
 
 
 45
 With these concerns noted, I nonetheless conclude that, under prevailing law and based on the record on the whole, the Commission adequately explained its decision in this case. I thus join the majority in affirming the Commission's conferral of authority on Star Lake.
 
 
 
 [1]
 The ICC also considered the impact of the Star Lake line and its accompanying mining operations on the Navajos' environment. I J.A. at 51. We find the Tribe errs in contending that the Commission restricted its analysis solely to the effects of the rail line itself, and not the related coal development, on groundwater. Petitioners' Brief at 27. Star Lake's Environmental Impact Statement examined the effects of both the immediate rail construction and the resulting coal development on water resources, including groundwater, and the ICC specifically relied on the EIS in its decision. I J.A. at 51